GEORGE JONES and Another v. MINNEAPOLIS & ST. LOUIS RAILROAD COMPANY and Another.[1]

January 8, 1904.

Nos. 13,684—(169).

**Common Carrier—Negligence.**

While an act of God will excuse a common carrier for loss of goods in his possession, yet, where the negligence of the carrier concurs in or contributes to the loss, he is liable therefor.

**Act of God.**

When, however, it is shown that the loss was due to an overpowering cause, the burden is on the opposite party to establish such negligence of the carrier.

**Evidence.**

The plaintiffs in this case delivered to the defendant certain cattle to be transported in one of its freight trains to their destination, but before it was reached the train was caught in a blizzard, became snow-bound, and the cattle froze to death. *Held*, that the proximate cause of the loss

[1] Reported in 97 N. W. 893.

was an act of God, and that the evidence did not support the verdict, to the effect that the defendant was guilty of negligence.

Action in the district court for Waseca county against Minneapolis & St. Louis Railroad Company and Great Northern Railway Company to recover $2,042 for the loss of cattle which perished in a blizzard while in transit over the line of the Great Northern Company. The case was tried before Buckham, J., and a jury, which rendered a verdict in favor of plaintiff for $1,200. From an order denying a motion for judgment notwithstanding the verdict or for a new trial, defendant Great Northern Railway Company appealed. Reversed, and judgment ordered for defendant.

*M. L. Countryman,* for appellant.

*John Moonan,* for respondents.

START, C. J.

On March 11, 1902, the Great Northern Railway Company, hereafter designated as the defendant, received at the Minnesota transfer, in St. Paul, two carloads of cattle, consisting of one hundred twenty calves, yearlings, and two-year olds, to be transported and delivered to the plaintiffs at Hinsdale, Montana. On March 14 the train of which the two cars were a part reached a point thirty miles west of Minot, North Dakota, which is the end of a division of the defendant's railway, where it was caught in a fierce blizzard, and a part thereof, including the two cars containing the plaintiff's cattle, was stuck in a snow bank, and before it was relieved the cattle were frozen to death. This action was brought to recover their value on the ground that their loss was due to the negligence of the defendant. The defense was that the loss was caused by an act of God, without fault of the defendant. At the close of the evidence the defendant requested the trial court to direct a verdict for it on the ground that the evidence disclosed no negligence on its part. The request was denied, and the cause submitted to the jury, and a verdict returned for the plaintiffs for $1,200. The defendant appealed from an order denying its motion for judgment notwithstanding the verdict or for a new trial.

The principal question here to be considered is whether the trial court erred in refusing to direct a verdict for the defendant. The law applicable to this case is well settled. While an act of God will excuse

a common carrier for loss of goods in his possession, yet, where the negligence of the carrier concurs in or contributes to the loss, he is liable therefor.    When, however, it is shown that the loss was due to an overpowering cause, the burden is on the opposite party to establish such negligence of the carrier.    Railroad Co. v. Reeves, 10 Wall. 176; Wolf v. American, 43 Mo. 421, 97 Am. Dec. 406, and notes.

It being undisputed in this case that the loss was due proximately to the storm—an act of God—the burden was on the plaintiffs to show that the defendant did or omitted to do, in the transportation of their stock, that which a reasonable and prudent person would have done or refrained from doing, and that such negligence was an active and co-operative cause of the loss.    We have, then, this question: Is the evidence sufficient to sustain the finding of the jury, to the effect that the defendant was guilty of such negligence?    We answer it in the negative.

There is but little conflict in the evidence, which establishes the following facts: The train containing the two cars of stock left Minot on the morning of March 14 at 8.35, and consisted of forty-three loaded cars.    The two cars, and three others, containing immigrants' movables, including live stock, constituted the rear of the train.    A short distance west of Minot, on an up grade, the train encountered a head wind, and was forty-five minutes behind time when it reached Des Lacs, a siding with a section house, thirteen miles west from Minot. At this point seven cars were taken out of the train and left on a side track, and the train about noon started on west.    At this time, according to the testimony of one of the plaintiffs, it was snowing and the wind was blowing, but it was not very cold, and it was not until the train was some distance west of Des Lacs that it got into the blizzard. The testimony, however, of the conductor of the train, and that of one of his brakemen, tends to show that when the train left Des Lacs it was snowing hard, and the wind was blowing some, but it was not cold; that it was a blizzard, and it was storming so hard that the signals given by the brakeman could not be seen the full length of the train, but there were then no signs of a blockaded road.

As the testimony of the conductor and brakeman as to the condition of the weather is more favorable for the plaintiffs than their own, it must, for the purposes of this appeal, be held that the weather when the

train left Des Lacs was as stated by them. The capacity of the engine under ordinary conditions was five hundred tons in excess of the weight of the train after it was lightened. As the train proceeded westward the weather grew colder, and the storm rapidly increased in violence and severity; becoming a raging blizzard before the train, two hours after it left Des Lacs, reached a point seventeen miles west of Minot, known as "Milepost 30." Here the train ran into a snow-drift, and could not go through it. The train was then backed out of the drift, and a run made for it, for the purpose of getting through it. The attempt was only partially successful. The engine and some fifteen cars went through the drift, and were cut loose and taken to Tagus Siding, two miles further west, where there was a telegraph station. The engine then came back, and succeeded in getting out ten more cars, which were taken to Tagus. The engine was then returned for the balance of the train, but the snow had by this time drifted to such an extent that the engine could not reach the train, and returned to Tagus, and the conductor sent west for relief from a freight train headed east.

The engine of this east-bound train cut loose from it, and, with its crew and some ten sectionmen with shovels, reached Tagus between 8 and 8.30 o'clock p. m., and proceeded to Milepost 30, and attempted to get the rest of the train out of the drift. The track from Tagus to Milepost 30 was comparatively clear, but when the engine neared the train a large drift, from two to six feet in depth, was formed across the track, and when the engine was within one hundred feet of the train it was buried so deeply in the snow that it could not be moved forward or backwards. The efforts of the sectionmen to shovel the engine out were unsuccessful, as the snow drifted in faster than they could shovel it out. Efforts to get the engine loose were continued until between four and five o'clock the next morning, when it froze up. The engineer froze his feet.

There was no side track or telegraph station at Milepost 30, which is a rough, unsettled country, and no facilities were at hand for shelter and caring for the stock. The evidence, however, tends to show that, if the stock had reached Tagus, it might have been there cared for. The blizzard proved to be one of the worst ever known in that country. The plaintiffs and the train and section men, with the exception of one

man, who, following the telegraph poles and wires as a guide, succeeded in walking to Tagus, remained in the caboose of the train, living upon food taken from the immigrants' cars. It was some four days before relief came to them and the train, by means of rotary snowplows cleaning the track. The stock perished from the cold while the cars were at Milepost 30. The crew of the train were experienced men, and familiar with the road and country over and through which they were running the train.

The complaint alleges, among other acts of negligence of the defendant, that the train ran too slow, and was behind time, and that the engine was not of sufficient capacity to handle the train. Those matters were rightly eliminated from the case by the trial court, for the fact that the train was behind time was not material, for, if the train had been on time, whether it would or would not have escaped the storm and snowdrift is a mere matter of conjecture. The undisputed evidence shows that the engine was of ample capacity to manage the train under normal conditions.

Two specifications of alleged negligence were submitted to the jury, and the plaintiffs here urge that the evidence is sufficient to sustain a verdict in their favor as to each of them. The first one was to the effect that the defendant was guilty of negligence in not setting out more cars at Des Lacs, and in running the train, with the cars of live stock, into the storm. The defendant's management of the train at Des Lacs must be judged by the facts as they appeared to the trainmen at the time. If they could have known or have reasonably anticipated that the storm would prove an unprecedented blizzard, there might be some reason for claiming that they were negligent in the particulars complained of. But they did not possess this post factum knowledge, and they cannot be charged with negligence because they did not judge with mathematical certainty just how many cars it was necessary to side track at Des Lacs to enable the train to get to a place where the live stock could be cared for. Nor were they negligent in going on west with the train at the time and under the circumstances disclosed by the evidence. They then had an unobstructed track, and, although it was then storming, they could not have reasonably anticipated the terrible conditions, due to snow, wind, and cold, which confronted them a few hours later.

The second specification of alleged negligence submitted to the jury was that the defendant was negligent in handling the train after it was stuck in the snow at "Milepost 30." The plaintiffs' contention in this connection is that it was negligence to run the train into the drift. Tested by the result, it may possibly have been an error of judgment to back the train and make a run for the drift in an attempt to get through it, but there is no evidence to show that the act, under the circumstances disclosed by the evidence, was negligence.

The plaintiffs further claim that

> "To leave this train in the drift, unassisted, one whole afternoon, until after eight o'clock at night, was negligence; that the evidence shows ample opportunity to aid and assist the train; that plaintiffs' stock could readily have been brought to a place of protection and safety; that there was a clear track, and assistance could have been sent from the east or west to this stalled train, which, if helped through this drift, would have gone readily on its way; and that the failure to do so, under the circumstances, was negligence."

We discover no evidence in the record supporting these claims. The efforts made by the trainmen to get the train out of the drift during the afternoon have been stated, and need not be repeated. If there was any reasonable opportunity to assist the train, except as we have stated, or any way to have readily brought the stock to a place of safety, we have failed to discover it by a somewhat careful reading of the record. It is true, there was a comparatively clear track for some distance to the west of "Milepost 30," but there was no evidence that the track was opened to Minot after the train was stalled in the drift, or that it was then practicable to secure relief from there. There is no evidence tending to show that the train crew did not send for relief to the only available source as soon as they found that they could not get the train out of the drift. In short, we find no evidence in the record fairly tending to establish the alleged negligence of the defendant, and hold that the trial court erred in not directing a verdict for it.

It is always with reluctance that we direct a judgment notwithstanding the verdict, for such a judgment ought not to be granted unless the evidence is practically conclusive against the verdict. In this case it is

not a question of the weight or preponderance of the evidence or the credibility of witnesses, but the question is whether there is any evidence fairly tending to support the verdict.

Having reached the conclusion that there is none, the order appealed from must be reversed, and the case remanded to the district court, with directions to grant the defendant's motion for judgment. So ordered.