## JOHN J. BRULLA v. JOHN CASSADY AND OTHERS.[1]

December 8, 1939.

No. 32,099.

*H. H. Sullivan* and *Peter Ahles,* for appellants.

*Freeman & King, Sam G. Gandrud,* and *Lauerman & Pfeiffer,* for respondent.

JULIUS J. OLSON, JUSTICE.

Plaintiff brought this action in June, 1937, to recover damages for personal injuries claimed to have been suffered on defendants' farm in Stearns county on August 21, 1935. The jury's five-sixths verdict was for $10,000. Defendants' motion for judgment notwithstanding or new trial was denied, whereupon judgment was entered February 4, 1939, for $10,570.49, and defendants appeal.

[1]Reported in 289 N. W. 404.

The claims of the parties are so conflicting that either one side or the other is guilty of deliberate perjury. Therefore it is necessary to state the contentions of the parties rather fully.

Defendant John Cassady, nearly 80 years of age at the time of trial, is the owner of several farms in the Eden Valley area, the home farm consisting of 284 acres, located approximately four miles from that village. There he and his wife have lived some 44 years, and their children since birth. He also owns a dwelling house in Eden Valley and, in addition, a large amount of live-stock, farm machinery, and equipment, including a truck used to haul grain and other produce, all located upon the home place. Defendants George and Angus are his grown-up sons. The family consists of the mentioned defendants, also a daughter Alice, a graduate nurse, and Mrs. Cassady, the wife and mother. They were all at home at the time the accident took place. The real farm work at the time the accident occurred and for some time prior thereto was in the hands of the sons. For their work they received a portion of the income from the place. On the morning of August 21, 1935, Angus took the farm truck to a granary upon a near-by farm, about a quarter of a mile away, to get a load of wheat, starting immediately after breakfast, about 6:30 o'clock. He shoveled the grain through a window in the granary into the grain tank on the truck, estimated at 100 bushels, and returned to the home farmyard to unload the grain in the granary there. He claims that he got back to the home place about 9:00 or 9:30 o'clock.

Plaintiff is a resident of the village of Eden Valley, occupying the dwelling house there owned by defendant John Cassady. He has occupied the place continuously since the fall of 1934, and was still such occupant at time of trial, April, 1938. The record discloses that the relationship between plaintiff and defendants had been pleasant and agreeable. As plaintiff was indebted to John for house rent and as his WPA work did not require all of his time, he had been on defendants' farm during August lending help in stacking grain and doing other farm work to be applied on past-due rents. On August 19 it was suggested that there was

a hole on the barn roof that ought to be repaired. Plaintiff readily agreed that he would do this work, he having some experience as a carpenter. During that afternoon he and Angus fixed up a 16-foot ladder to be used by plaintiff in getting onto the roof. The ladder was left lying near the northwesterly corner of the barn which at that point is a lean-to of the main structure. That evening and the following night the weather became rainy, hence on the 20th no effort was made to repair the roof. At seven o'clock on the morning of August 21 plaintiff drove up to the Cassady home and parked his truck a short distance west of the dwelling house, his usual parking place. His testimony is that after so parking his truck he proceeded to the garage located some distance southwesterly from the house. There he picked up a bundle of shingles. He then proceeded from the garage to the blacksmith shop, a short distance to the north, and there picked up a claw hammer. With the shingles and the hammer in his hands he then proceeded to his truck, his purpose in so doing being, so he says, to place the truck near the edge of the barn lean-to and to place the ladder on top of it so as thereby more readily to reach the place where his work was to be done. He describes the accident thus:

"While I was walking over to my truck all at once back from out behind the bunch of machinery—there was a bunch of machinery standing in front of the blacksmith shop and a lot of brush down all along the road, and there was fence posts there and they was about five or six feet high, and I stepped out between the machinery a little ways a few steps and I heard a noise and I looked back and here was the International truck and I seen Angus was driving the truck and that is all I can remember of that."

The location of the place where the injury occurred, according to his claim, is something like 130 to 150 feet from where defendants say plaintiff was found. Defendants' testimony is that plaintiff was found unconscious beside the barn on the westerly side and directly below the place where the repair to the roof was to

be made; that a bunch of shingles was lying on the roof of the barn and that there were traces on the roof showing plaintiff had slid down and onto the ground some 17 feet below the edge of the lean-to eaves. Shortly prior thereto George had driven the cows out of the cowpen immediately west of the barn. On his way back he noticed there was some commotion amongst the pigs so he went over to the barn and saw plaintiff lying on the ground. The ladder had fallen but the shingles were on top of the roof. He immediately, upon discovery of plaintiff's obvious injuries, started toward the house, meeting his father on the way and telling him that Brulla was hurt. He called up Dr. O'Connor at Eden Valley, and some 10 or 15 minutes later the doctor arrived. In the meantime, George, thinking the doctor was slow in coming, put through another call, but was then informed the doctor was on his way. Cassady, Sr. immediately went to the place where plaintiff was lying. He testified that plaintiff talked incoherently, as if he were drunk, and that the hammer was lying near by. He went to the garage and brought out an auto robe upon which he put plaintiff and remained right there with him until the doctor arrived at or prior to 7:30 a. m. The doctor testified he found plaintiff there; that he observed plaintiff had suffered fractures of both wrists and forearms and that there was an abrasion on his forehead from which a little blood was flowing; and that he was practically unconscious. Without any waste of time plaintiff was placed in the doctor's car and taken to Richmond and there placed in the hospital of Dr. Koepp, where he remained in his charge some five days and until removed to the Veterans Hospital at Minneapolis. Dr. O'Connor rendered assistance during the time plaintiff was at the Richmond hospital. A thorough examination of plaintiff was made by Doctors Koepp and O'Connor, and it was found that plaintiff had compacted fractures of both wrists and forearms; that the left ilium bone had been fractured; and that there was an abrasion on his forehead. They discovered no bruises, contusions, or cuts on his body except that appearing on his forehead. Before Dr. O'Connor left the Cassady home he asked Mr. Cassady, Sr. who was to pay for hospitalization and

other incidental expenses. He was told to go to the township officers of Eden Lake. The township officers, however, disclaimed liability and asserted that the Eden Valley council should be contacted for the purpose of meeting the charges that undoubtedly would have to be incurred. It is apparent that several members of the Eden Valley council, including its police officer, a Mr. Kurtz, shortly thereafter appeared at the Cassady home for the purpose of ascertaining how the accident happened. They were shown the place where plaintiff was found. They discovered nothing other than what already has been related. The sheriff of Stearns county was notified by a member of the Eden Lake township board, and he came to the Cassady home about 12:30 o'clock accompanied by Mr. Kurtz. They too made careful investigation of the premises with the object in view of determining the facts in respect to how and where the accident took place.

Thus far we have stated the facts substantially as outlined in defendants' brief. With respect to these plaintiff in his brief says:

"For the sake of brevity we are omitting entirely a statement of the facts in this case and in lieu thereof we adopt the statements given by the appellants as being substantially correct, except for the statements about the absence of marks on the ground and absence of shingles in the farmyard." As to how plaintiff was hurt, he asserts that "upon suddenly being confronted with the inevitable collision with the truck [he] instinctively put forward his hands in the direction of the approaching vehicle to protect himself or ward off the blow, enough pressure would be exerted in throwing him out of the path of the truck to cause the impacted fractures. On the other hand, if he was struck on the left hip as the fracture of the ilium indicates at a time when he was leaping forward in an effort to get out of the path of the swiftly approaching truck, the additional momentum given to his body by the blow received on the hip or ilium from the speeding truck would cause him to fall forward, striking the palms of his

hands on the ground with sufficient force to cause the impacted fractures."

Having thus shown, as he claims, how the accident took place and how the injuries were inflicted and seeking wholly to do away with defendants' claim otherwise, he advances the theory that "it would be a very easy task for Angus Cassady to pick up the prostrate and unconscious body of Brulla and carry it back of the barn to conceal the fact that he had caused Brulla's injury and to make it appear that Brulla had fallen off the roof of the barn." With regard to the bunch of shingles on the roof of the main barn and the skid marks on the lean-to (the lean-to has a tin or metal sheeting roof), his explanation is:

"Those shingles might have been on that lean-to for some time and the rain water seeping through the shingles and onto the metal roof during the rain of the day preceding the 21st of August in question could have caused the discoloration or so-called marks on the roof. * * *" that "the hammer was picked up in the yard by the Cassadys when they picked up the shingles which Brulla was carrying and the hammer and the shingles were put away by the Cassadys in carrying out their plan and scheme to avoid liability for Brulla's injury."

He further contends that it was "physically impossible" for plaintiff to get onto the roof of the lean-to because the ladder was one and two-tenths feet shorter than the height of the eaves; and, lastly, "that all of the evidence of the defendants should really be omitted from" the case "because it is elementary that only such evidence that supports the verdict can be considered" on appeal.

■ We cannot accept plaintiff's suggestion that all of defendants' testimony should be discarded. Rather, we think, it is our duty to search the record and from it ascertain whether, "upon all the evidence," the verdict finds support. The rule is that:

"A verdict may be directed only in those unequivocal cases where it clearly appears to the court on the trial that it would be its manifest duty to set aside a contrary verdict as not justified

by the evidence or as contrary to the law applicable to the case. Though the evidence on the part of the plaintiff standing alone would justify submitting a case to the jury, yet the court should direct a verdict for the defendant if, upon all the evidence, it would be its manifest duty to set aside a verdict against him. In other words, the court should direct a verdict in favor of a party in whose favor the evidence overwhelmingly preponderates, though there is some evidence in favor of the adverse party." (6 Dunnell, Minn. Dig. [2 ed. & Supps.] § 9764.)

In the late case of Yates v. Gamble, 198 Minn. 7, 15, 268 N. W. 670, 674, we concisely said that:

"The court should direct a verdict for defendant if upon all the evidence it would be the manifest duty of the court to set aside a verdict against him. Giermann v. St. P. M. & M. Ry. Co. 42 Minn. 5, 43 N. W. 483; Pennsylvania R. Co. v. Chamberlain, 288 U. S. 333, 53 S. Ct. 391, 77 L. ed. 819."

These facts appear without dispute: There was a small hole on the shingle roof of the main barn. Plaintiff had agreed to repair it. That was his purpose on coming to the Cassady farm that morning. A ladder had been fixed up two days before for the purpose of affording plaintiff a means of getting up there to make the repair. He procured the shingles and the hammer, and the sheriff testified that in examining his clothes at the hospital two or three days after the accident he found that in the right-hand pocket of his jacket there was a handful of shingle nails. There was a bunch of shingles on top of the main barn roof near the hole to be repaired. On the lean-to there were skid marks indicating that someone had been there while the roof was still moist. If, as claimed by plaintiff, it was impossible to get on top of the lean-to and then proceed to the main barn shingle roof, it was likewise impossible for any of defendants so to do. That someone got there is clear. In addition, we have the physical facts in respect to plaintiff's hurt. Both forearms and wrists were badly fractured. There was a contusion on his forehead indicating that he had come in contact with something hard. There was no other out-

.ward mark, contusion, or discoloration discovered upon his body by the doctors who examined him and under whose care he was while at Dr. Koepp's hospital. That clearly disposes of plaintiff's suggestion that he was struck on the left side and thrown forward. Doubtful and highly improbable also is the theory that plaintiff's wrists were broken by guarding himself against a fast-moving truck (as claimed by him) without being run over or having his clothing torn or his body bruised by being dragged along until the truck stopped. No such injuries appear. There were no torn clothes. His only visible bruise was to his forehead. If that was caused by being struck by the truck he probably would have fallen backward and been run over or otherwise bruised by being dragged.

A fall from the lean-to roof to the ground below is a much more probable cause of the kind of fractures to his arms and wrists as here disclosed. The injury to his head indicates that the fall and momentum of the body not only crushed his forearms and wrists but also caused his head to strike the ground. The broken ilium can be accounted for by the fact that as the body plunged downward to the ground below the legs would naturally be thrown over and toward the direction in which plaintiff fell. The ilium is (Dorland, Medical Dictionary [15 ed.] p. 595):

"1. The haunch bone, distinct in fetal life, but becoming the wide upper portion of the innominate [hip] bone. 2. The flank."

Kessler, Accidental Injuries, "Fractures of the Lower Extremity," p. 209, says:

"Fracture of the wing of the ilium is very frequent, since it is the thinnest portion of the pelvis and the most exposed. Since there are no interruptions in the continuity of the bony arch and no involvement of the adjacent articulation, the condition is not serious."

The imputation that Angus ran his truck into or upon this man at a high rate of speed, causing unconsciousness, and thereupon picked him up (his weight was between 165 and 170 pounds) and

carried him at least 130 to 150 feet from the place where plaintiff says the accident took place to where he was found by George, and momentarily later by the father, and within 10 or 15 minutes later by Dr. O'Connor, is an act so brutal, inhuman, and fiendish that we should not accept it as true unless the facts and circumstances unerringly point to such a conclusion. Not only must we condemn Angus as a deliberate perjurer, but likewise George and their old father, now rapidly approaching the time when he must answer the final call. That these men would conspire to commit such a despicable crime to bring to fruition the plan and scheme, so foul and so criminal as this, seems impossible of belief. No one reading this record, if fair-minded, can come to the conclusion that they, or any of them, are of such a type. Not one of them is impeached. Their stories under oath appear reasonable and probable. In the main they harmonize with each other. If a story had to be invented would it not have been more probable that both Angus and George would have seen plaintiff reach. the lean-to roof; that they saw him walk along its easterly edge and next to the barn to the place where the hole to be repaired was located; that suddenly he started to slip on the moist and smooth metal roof and fell to the ground.

That plaintiff was badly hurt is conceded; that he has a family of seven children, ranging from an infant in arms to 17 years, and a wife, all naturally dependent upon him, is likewise apparent. Then, too, he was poor; only as a WPA worker "he had a steady job" at and prior to his injury. On the other side was John Cassady, a well-to-do, hardfisted son of the soil. By thrift and hard work he had accumulated much property. Plaintiff was hurt while working on the Cassady farm. What more rational and reasonable to the average juror than just that setup to bring about the substitution of pity and compassion for that of calm, cool, and impartial deliberation in determining the real cause of his injuries?

It is well at this point to call attention to the testimony of the sheriff, who came to the place about 12:30 o'clock with the village marshal, Mr. Kurtz. He testified that he climbed the lad-

der and looked over the roof. He saw the hole, the bunch of shingles, and the place where something had skidded or slipped on the way down the metal roof of the lean-two. On the third day after the accident he visited plaintiff at Dr. Koepp's hospital, and this conversation between the witness and plaintiff took place:

Q. "Will you tell the jury what you said to him and what answers he made to you?

A. "When I went in the room I walked up to the front of the bed and spoke to him and I said 'hello' and he said 'hello.'

Q. "Had you known Mr. Brulla for any length of time?

A. "Yes, sir.

Q. "That is, you and he had been acquainted for some time?

A. "Yes, sir.

Q. "About how long?

A. "Oh, possibly eight or ten years.

Q. "What other conversation, if any, took place after what you have told us?

A. "I said, 'What has got you up here, what happened?'

Q. "Is that what you said?

A. "That is what I said. I said, 'What happened to you, what has got you up here?' And he kind of smiled and said, 'I don't know.' And I said, 'Gee whiz, what is wrong?' And he kind of looked at me and kind of smiled and I said, 'Was you up on that barn out there,' and he said, 'I don't know.' And I said, 'Did you go up there to repair that roof of the barn at Cassady's,' and he said, 'Is the roof repaired,' and I said, 'No, it is not but there is a bunch of shingles up on the roof.' And he said, 'How big a bunch,' and I said, 'Probably six or eight shingles is my recollection of it.' And he said, 'If the shingles are up there I must have done it because the Cassady boys would not go up on the roof.' "

Against that we have the assertion of plaintiff that he was wholly unconscious at all times from the time of his injury until after he had arrived at the Veterans Hospital. That is somewhat fortified by a lay friend of his who claims he sat up with him at

least the greater part of the time while at Dr. Koepp's hospital. It is rather surprising that the trained nurse employed and on the job was not called, nor was Dr. Koepp.

A competent engineer prepared a plat drawn to scale showing the location of the highway running east and west 212 feet north from the place where plaintiff claims he was run into by the truck. The private driveway to the Cassady farm leads southerly therefrom and directly to this place. It is an open lane at least 30 feet in width with the wheel tracks in the center. Anyone standing at or near the place where plaintiff claims the accident occurred could not help seeing the truck coming all the way down from this highway. No one, other than the plaintiff, claims there was anything to obstruct his view.

Plaintiff also makes the argument that the Cassadys did not point out to the visiting officers of Eden Valley or to the sheriff where the collision took place between plaintiff and defendants' truck. Obviously they could not point out something the existence of which they did not know and which, if they tell the truth, did not exist.

All the officers who called that morning and at noon had in mind the ascertainment of the facts causing this accident. That is what they went there for. John Cassady and his family were long-time and respected residents of that neighborhood. Plaintiff had been hurt while there at work. Naturally and properly they came to the place to, if possible, hang responsibility upon the Cassadys. In reaching the farmyard and particularly the place between the machine shed and the house where the now claimed collision occurred they could not help seeing what was in the middle of the private road. They came over the same route. If there had been any suspicious car or skid marks or anything else indicating any recent change, it is not likely that they would have overlooked it. Nor is it likely that they would have overlooked questioning Angus and have insisted upon an examination of his truck to see whether it bore any marks of having been in an accident. They were content with the information there gained and found. They were given the facts and circumstances respect-

ing the hole in the roof, the shingles lying near by, and the place where Dr. O'Connor found plaintiff, some eight or ten feet west of the lean-to. Another feature not to be overlooked is the fact that no one in the Cassady family knew of the present claim of plaintiff until more than two months later when plaintiff had returned to the Cassady house at Eden Valley and was there visited by Mr. Cassady, Sr. Then for the first time plaintiff claimed that he had been run into by the truck. When he first thought of the present story or communicated it to anyone is not disclosed.

When plaintiff arrived at the farm that morning he knew exactly what he was going to do and was not awaiting orders or directions from anyone. If he needed his truck at the side or at the north end of the lean-to to help him reach the roof it would seem that instead of driving easterly and parking his truck near the farmhouse he would have gone westerly to the place to which he said he was to bring his truck after he had gathered up the shingles and the hammer.

Just one thing more: Angus left for the garage to start hauling wheat about 6:30 o'clock. If plaintiff's story is true he must have got back within 30 or 35 minutes thereafter, because it is not likely plaintiff had consumed more than five minutes in getting the shingles and the hammer before being on his way to his truck. It is while making this movement that he claims to have been hurt. Angus was alone in doing this job of hauling wheat. Obviously he had to back his truck to the window from which to shovel the grain. From time to time it would be necessary for him to level off the wheat in the truck box, as shoveling grain from a window or other small opening necessarily leaves a limited space within which to shovel the grain. By weight 100 bushels of wheat amounts to 6,000 pounds. It would seem that shoveling by hand this amount of grain through a window and into a truck box, including also the time consumed in getting there and back to the farm, was much more than a half-hour job. Angus testified he was gone about two hours. That much time does not seem unreasonably long, nor is there any testimony that it was.

■ We have thoroughly read and considered the entire record, a very voluminous one containing 550 printed pages. Only the more essential facts have been stated but we think enough thereof to give anyone, including the parties to this cause, a fair view of what the record really discloses. A fixed-up story, no matter how cleverly done, will, as here, contain discrepancies and serious faults. We have pointed out those which strike us as being the most obvious. There should be an end to this litigation. Plaintiff has had his day in court. We can see no advantage or benefit to anyone by granting a new trial. Upon the facts shown by this record he cannot recover. In this case, "where the evidence is 'so overwhelmingly on one side as to leave no room to doubt what the fact is, the court should give a peremptory instruction to the jury.'" Pennsylvania R. Co. v. Chamberlain, 288 U. S. 333, 343, 53 S. Ct. 391, 395, 77 L. ed. 819, 824. The undisputed physical facts, the nature of plaintiff's injuries, the improbability if not impossibility of plaintiff's story being founded upon anything other than selfish imagination if not wilful falsehood—all combine to negate the possibility of imposing liability upon defendants. Nor is there any reasonable probability that a new trial will add anything of substance to plaintiff's cause. The judgment is therefore reversed and judgment ordered for defendants notwithstanding the verdict.

So ordered.

GALLAGHER, CHIEF JUSTICE and PETERSON, JUSTICE (dissenting).

While we feel that a new trial of this case should be granted, we do not believe that the record justifies ordering judgment notwithstanding the verdict. That plaintiff was seriously injured in some manner is conceded. If he was injured in the manner testified to by him, he should recover. As to whether he was injured in that manner or by falling off a barn, as claimed by defendants, was a fact question for the jury. After seeing the witnesses and hearing their testimony, the jury resolved the fact question in plaintiff's favor and the trial court approved its verdict. The rule is that if there is some evidence reasonably tend-

ing to prove a good cause of action or defense judgment should not be ordered. 3 Dunnell, Minn. Dig. (2 ed. & Supps.) § 5082; Bragg v. C. M. & St. P. Ry. Co. 81 Minn. 130, 83 N. W. 511; Berghuis v. Schultz, 119 Minn. 87, 137 N. W. 201. It should not be ordered when there is a clear conflict in the testimony upon material issues. 3 Dunnell, Minn. Dig. (2 ed. & 1937 Supp.) § 5082; Hess v. G. N. Ry. Co. 98 Minn. 198, 108 N. W. 7, 803; Wright v. Post, 167 Minn. 130, 208 N. W. 538. It should not be ordered unless the evidence is practically conclusive against the verdict. 3 Dunnell, Minn. Dig. (2 ed. & Supps.) § 5082; Jones v. M. & St. L. R. Co. 91 Minn. 229, 234, 97 N. W. 893, 103 A. S. R. 507; Hume v. D. I. R. R. Co. 149 Minn. 245, 183 N. W. 288; Trovatten v. Hanson, 171 Minn. 130, 213 N. W. 536.

A division of opinion among the members of the supreme court as to the effect of the evidence is a demonstration that the verdict should stand. 3 Dunnell, Minn. Dig. (2 ed.) § 5082. This court speaking on that subject in the case of Moody v. C. N. Ry. Co. 156 Minn. 211, 215, 194 N. W. 639, 640, said:

"A division of opinion here as to the effect of the evidence is a demonstration that the verdict should stand. Unless the members of an appellate court agree that a verdict is without support in the evidence, it can hardly be said that the trial judge erred in denying a motion for judgment notwithstanding the verdict because there was no room for a difference of opinion among reasonable men."

It seems to us that the case is one where a new trial should be granted in the interests of justice. At the oral argument counsel for both sides frankly stated that either the cause of action or defense was manufactured. The controversy cannot be the result of mistake. All of the lawyers connected with the case are men of high standing at the bar. We feel certain that none of them would knowingly become a party to a case involving deceit. It is very apparent that those associated with plaintiff's case or defendants' case have been misled. The record, particularly that part thereof pertaining to the question as to whether there were

bruises on plaintiff's body when taken to the hospital, is quite unsatisfactory. While Dr. O'Connor took plaintiff to the hospital and rendered some assistance to Dr. Koepp, who took over the case, he did not positively testify that there were no bruises on plaintiff's body. In answer to an inquiry as to whether he saw any bruises on the body, Dr. O'Connor testified: "I don't think I did; I can't recall that I did." It must be remembered that the accident occurred on August 21, 1935, and the case was not tried until April 22, 1938. Attending hundreds of cases in the meantime, it would be exceedingly difficult for any doctor, without the aid of his records, to testify as to the existence or nonexistence of bruises. For some reason, Dr. Koepp, the attending physician, was not called as a witness nor were any of the nurses at the hospital where plaintiff was confined.

The injuries are of a very serious nature, as evidenced by the amount of the verdict. If the case has been manufactured by the plaintiff, a tremendous injustice would result in permitting the verdict to stand. If on the other hand a defense such as the one presented here is not real, granting judgment notwithstanding would result in a great injustice to plaintiff. It seems to us that the interests of justice would be better served by granting a new trial in the hopes that the "truth will out."