## JANE ANN LIEBERMAN, A MINOR, BY NORTON C. LIEBERMAN, AND ANOTHER v. HARRY KORSH AND OTHERS.

119 N. W. (2d) 180.

December 7, 1962—No. 38,506.

*Phillips & Gross,* for appellants.

*Carroll, Thorson, Anderson & Cronan* and *Herbert C. Davis,* for respondents Korsh.

*Diessner, McEachron, Wurst, Bundlie & Carroll* and *John A. McEachron, Jr.,* for respondents Bellman.

MURPHY, JUSTICE.

This case is before us on appeal from an order of the district court denying plaintiffs' motion for a new trial. It involves a claim for personal injuries sustained in an automobile accident and a claim for medical expenses incurred as a result. The plaintiffs complain that the verdict is inadequate in that the jury denied damages for asserted permanent injuries. Numerous errors are assigned, the principal one of which is that the court's instructions were erroneous and prejudicial.

The action is brought by Norton C. Lieberman as the father of his minor daughter, Jane. At the time she sustained her asserted injuries she was 14 years of age and a guest in an automobile owned by the defendant Harry Korsh, which was operated with his permission by his son, Ronald Korsh. The accident occurred on August 16, 1958, at about 11:30 p. m. when the Korsh automobile collided with a

telephone pole at a street corner in the city of St. Louis Park. It seems to be conceded that the accident occurred through the negligence of the driver.

It appears from the record that at the time of the accident Jane occupied the front seat, and when the collision occurred, she was thrown against the front of the automobile and suffered bruises to her chest and to her left knee, one of her front teeth was chipped, and she suffered a laceration of the lower right lip. There was no evidence that she was rendered unconscious, and beyond the injuries already described the record establishes no more than that she was left in a dazed condition due to the injury and shock following the collision. After the accident she was taken to the hospital in an ambulance. She remained there overnight and was attended by the family physician. No internal injuries were found and she was accordingly discharged the next day. While she was in the hospital, no examination was made for head injuries. She stayed at home for a week following the accident because she didn't feel well. She testified, "I was tired, and I had kind of a headache and everything, and my lip looked ishy." Her mother called the family physician several times and reported that Jane was having occasional headaches. Simple headache remedies were prescribed. Jane stated that on October 22, 1958, while at the home of a friend who had been ill, she felt dizzy and she lost consciousness and fell. A witness testified, "She fell straight down, * * * stiffly * * *, her eyes kind of blinked and her cheek twitched." Although two other persons witnessed this incident, which is characterized by the plaintiffs as an epileptic seizure, the record does not indicate that they were called to testify.

After the incident of October 22, her parents consulted Dr. Shapiro, a neurologist. Dr. Shapiro testified that he took Jane's past medical history, from which it appeared that she commenced to complain of headaches about September 3, 1958. These headaches occurred daily but were not severe. They were described as being mainly frontal and temporal in location and were relieved by aspirin. She had dizzy spells of brief duration. In these spells she experienced the phenomena of Deja Vu, which the doctor described as a feeling of familiarity or past experience in situations where she had been for the first time.

She complained of intermittent low back and shoulder pains. Dr. Shapiro concluded that the spell or seizure of October 22, when she apparently fainted and lost consciousness, resulted from a disordered brain condition. He was of the belief that aside from the injury sustained in the accident there was nothing in her past medical history which could account for this condition. She was accordingly hospitalized at Mount Sinai Hospital from October 24, 1958, to November 1, 1958. During this time certain tests, including electroencephalographic studies and X-rays, were made. It appears that the electroencephalogram is one of a number of recognized tests used in the detection of brain injuries. By use of small metal discs or needles which are applied to the scalp in places which correspond to different parts of the underlying brain, the brain waves are electronically recorded by an ink writer on a chart. It appears that by this process abnormal functioning of the brain may be detected. On the basis of the tests given, Dr. Shapiro came to the conclusion that Jane suffered from post traumatic epilepsy, which accounted for the headaches, sensations, and spells of which she complained. After making this diagnosis, Dr. Shapiro prescribed a course of treatment calculated to prevent a recurrence of the episode of October 22. Anticonvulsant medicine was prescribed. The patient was advised to avoid emotional stress, keep regular hours, to abstain from the use of alcohol, and not to engage in such physical activities as swimming or driving an automobile.

In the course of the examination and treatment Jane visited Dr. Shapiro's office on 31 occasions. During that interval the medication was varied from time to time. Dr. Shapiro was of the view that the continued use of anticonvulsant medication has prevented the recurrence of the spell or seizure experienced on October 22. He expressed the opinion that the brain injury, which he characterized as post traumatic epilepsy, was a direct result of the injury sustained in the automobile accident of August 16, 1958. He was of the opinion that the condition was "persistent and permanent." He explained that her epilepsy was of the temporal lobe type which manifests itself in an abnormal discharge of a group of nerve centers and that in this type of epilepsy there may be transient attacks of dizziness or it may result in a psychic phenomena which would account for her experience

of Deja Vu. The medication prescribed was calculated to "keep down the amount of abnormal discharges so the discharge doesn't spread and produce unconsciousness." He explained that as a result of the trauma certain tissues in the nervous system had been destroyed, leaving scar tissue which irritates the surrounding nerve cells. This condition, he said, was permanent, and as to future medical expense he predicted, "Well, assuming that she runs a most favorable course, it would be a minimum of about $100 a year."

Dr. Fernando Torres, assistant professor of neurology and head of the electroencephalography laboratory at the University of Minnesota, also testified in behalf of the plaintiffs. He examined the electroencephalograms introduced in evidence and expressed the opinion that they ranged from abnormal to markedly abnormal. He expressed the opinion that Jane was suffering from an illness. He said, "I don't think I can say what the illness is; I don't think I can tell what the illness is. I know the patient has something abnormal, I can tell from that." He further expressed the opinion that the abnormalities were caused by the accident.

The defense vigorously attacked the conclusions of the plaintiffs' medical experts. This attack was directed to the absence of evidence of a trauma to the head of sufficient force to cause a concussion which would produce the grave injury of which the minor plaintiff complains.[1] Moreover, the defense emphasizes that aside from the medical history testified to by the plaintiffs' expert there is a paucity of evidence bearing upon the spells or seizures of which the girl complained. Two neurologists who testified for the defense discounted the value of the electroencephalographic tests. They agreed that while the results of these tests showed some abnormality, they were nevertheless within the range which might be expected from a test taken of a girl of Jane's age. One of the doctors testified:

"First of all, the head injury was minor, did not produce any loss of consciousness. Secondly, the picture we see in the electroencephalogram is not consistent, as far as I am concerned, with a head injury

---

[1]The record does not contain information as to the speed of the car or force of the collision at time of impact.

of the magnitude that she had. The electroencephalogram showed changes in all areas, which would not be consistent with a blow to the head or a blow to the jaw to drive a tooth through the jaw. It would be even difficult to subscribe to this to even a severe head injury because of the multiple changes all over the head from side to side from different times. * * * It is my feeling that this represents the 15% of people that have abnormal electroencephalograms. To some degree or another, it varies in some studies as high as 40% that certain types of individuals have abnormal EEGs. And I do not believe that these represent an abnormality as a result of the accident."

He expressed the opinion:

"* * * It is my feeling that this simply represents Jane's electroencephalogram. These abnormalities often appear in the individuals that are going to have the abnormalities about the time of puberty. * * * they are related to hormonal changes within the body, affecting the * * * electrical chemical changes within the brain, because the entire body is changed at that time and the brain is changed at that time, too."

The jury returned a verdict in favor of Jane in the sum of $750. The jury also returned a verdict in favor of her father, Norton C. Lieberman, in the sum of $400.05. This included the sum of $104 for services of Dr. Perlman, the family physician; $250 to Dr. Chesler, who performed surgery on Jane's lip; and $46.05, the original hospital bill. It is apparent from the verdict that the jury rejected as special damages the claim for services of Dr. Shapiro and the cost incurred in connection with the electroencephalograms and other tests and treatment relating to the alleged epileptic condition. It is also apparent that general damages for the asserted epilepsy were also denied. The verdict in Jane's favor for $750 obviously would not go beyond compensating her for pain, suffering, bruises, and the disfigurement to her lip.

It is plaintiffs' contention that the verdict is manifestly contrary to the evidence and that the jury failed to return a verdict for the actual special damages and for general damages resulting from the asserted

epileptic condition because of the erroneous instructions given by the trial court.

1. Preliminary to discussion of the trial court's instructions in this case it should be noted that an appellate court should view the instructions as far as possible from the standpoint of the total impact or impression upon the jury. The real test is "what might the jury have understood from the language of the court?" Mailand v. Mailand, 83 Minn. 453, 455, 86 N. W. 445; Geddes v. Van Rhee, 126 Minn. 517, 148 N. W. 549. In Zurko v. Gilquist, 241 Minn. 1, 5, 62 N. W. (2d) 351, 354, we said:

"* * * in construing a jury charge as a whole, it must be scrutinized and tested from the standpoint of its total impact or impression upon the jury. If as a whole its impact gives the jury an erroneous conception of the controlling principles of law, then it cannot be defended and found sufficient as a whole by a careful analysis of the technical relations of its various provisions to each other when such technical relationships would not reasonably have been apparent to the jury."

With these principles in mind we have carefully examined the court's instructions. After correctly charging the jury on the subject of negligence, the court went on to discuss the subject of damages as bearing upon the elements of pain and suffering and disfigurement. The jury was told that the father would be entitled to recover for expenditures made in connection with "care by doctors reasonably required and actually given in the treatment * * * including * * * X-ray pictures, if any, the reasonable value of hospital accommodations and care, if any, reasonably required and actually given in the treatment of said plaintiff." The trial court then instructed on the issue of damages for permanent injuries and correctly told the jury that plaintiffs were required to prove by a fair preponderance of the evidence to a reasonable certainty that the injuries were permanent and the direct and proximate result of the accident. The jury was then told:

"In that connection, I will point out to the jury that mention was made by counsel for the plaintiff in his closing argument that this would be a barrier to employment, and a problem in marriage. That is not properly a question for consideration, in the consideration of

damage in this particular case, because it has not been revealed by the evidence as being a question involved in this particular case."

It is the foregoing instruction that the plaintiffs contend is responsible for the fact that the jury did not return a verdict which might compensate the plaintiffs for permanent injuries and future medical expense.

2. It was not necessary for the plaintiffs to introduce specific evidence bearing upon the loss of future earning capacity. We must conclude that it was error to instruct the jury that no recovery could be had even though, as the court expressed it, the girl's injuries would be a "barrier to employment," because "it has not been revealed by the evidence as being a question involved in this particular case." It would be unlikely that a girl 14 years of age, without a record of past earnings, would be able to introduce specific evidence as to impairment of earning capacity, which is an item of general damages. We held in Wilson v. Sorge, 256 Minn. 125, 97 N. W. (2d) 477, and Zaikaner v. Small, 256 Minn. 275, 98 N. W. (2d) 247, that recovery may be had for impairment of future earning capacity notwithstanding the absence of evidence to show what the injured person could or would have earned if he had not been injured. In the Wilson case we said (256 Minn. 132, 97 N. W. [2d] 483):

"* * * impairment of earning capacity is an item of general damages. It permits recovery for a loss or diminution of the power to earn in the future and is based upon such factors as the plaintiff's age, life expectancy, health, habits, occupation, talents, skill, experience, training, and industry."

If the jury had found that the injuries complained of were proximately caused by the accident, they could determine under the circumstances of this case the amount of damages after considering the elements above stated.

It is conceded by counsel for defendants that on the basis of the record a question of fact was presented as to whether or not Jane sustained a post traumatic epilepsy which would entitle her to damages for permanent injuries. If the jury in fact believed the medical experts who testified for the injured girl, they would, in fixing damages, be entitled to consider the effects of the injury as bearing upon impair-

ment of her future earning capacity. Moreover, if they chose to believe Jane's claims as to the nature of the injury, they could consider how it would affect her future life, both in employment and social relationships. We cannot escape the conclusion that the effect of the instruction was not only to remove from consideration by the jury an important element of damages but to lead the jury to believe as well that other items of permanent damage, including impairment of mental capacity and future medical expense, were also removed from their consideration.

It is the contention of the defendants that the verdict definitely establishes that the jury rejected Jane's theory that her condition was caused by the accident. This claim is based upon the fact that the jury did not include in its verdict those special damages which related to the care and treatment of Jane's epileptic complaints. While this fact is self-evident, we cannot safely assume that the jury's action in so finding was prompted by their belief that the plaintiffs' claims were so farfetched as to be unworthy of credence. The jury's action could have been prompted by the instruction to the effect that no recovery could be had for impairment of her capacity to make a living or impairment of her prospects of marriage. The jury could well have understood from such an instruction that the entire issue of permanent damage was out of the case. We cannot say from an examination of the charge as a whole that the plaintiffs were not prejudiced by this instruction. Since the instruction was erroneous and we are unable to determine its effect, a new trial must be granted.

Reversed.