## MARY McCORMICK AND ANOTHER v. JOSEPH MALECHA AND ANOTHER.

122 N. W. (2d) 446.

June 28, 1963—No. 38,738.

*Murnane, Murnane, Battis & deLambert,* for appellants.
*M. J. Daly,* for respondents.

MURPHY, JUSTICE.

This is an appeal from an order denying defendants' alternative motion for judgment notwithstanding the verdict or a new trial on all of the issues or on the issue of damages alone. The appeal involves two actions which were consolidated for trial. They grow out of a collision between two automobiles coming from opposite directions. One of the actions is by Mary McCormick for personal injuries and the other by her husband, Patrick McCormick, for personal injuries and special damages including loss of his wife's services. The principal issues which we consider are raised by the defendants' claims that the trial court erred in directing a verdict for the plaintiffs on the issue of liability and that the damages awarded were excessive.

From the record it appears that on October 8, 1960, Patrick McCormick, with his wife as a passenger, was driving a Chevrolet automobile in an easterly direction on State Highway No. 19. McCormick was following his brother-in-law, Albert Ruhland, who was driving a Ford automobile some distance ahead of him. At the same time the defendant Dale F. Malecha was driving a Mercury automobile belonging to his father, defendant Joseph Malecha, in a westerly direction on the same highway. It is undisputed that Malecha was driving at an excessive rate of speed. It appears from his own testimony that in order to avoid a

rear-end collision with the car ahead of him, he applied his brakes and veered into the lane of traffic in which the Ruhland and McCormick cars were traveling. He sideswiped the oncoming Ruhland car and then collided with the plaintiffs' automobile.

■ No evidence was introduced by the defendants on the issue of liability. After both parties rested, the trial court concluded that the defendant was negligent as a matter of law and that his negligence was the proximate cause of the damages sustained by the plaintiffs. He accordingly directed a verdict for plaintiffs on the issue of liability. The defendants do not seriously contend that Dale Malecha was not negligent. They argue, however, that the court should have submitted to the jury the issue of McCormick's contributory negligence. This claim is based upon certain statements by McCormick at the trial from which they argue that when the Malecha and Ruhland cars met, McCormick was back a sufficient distance to allow ample time for him to stop and avoid the accident. When McCormick was asked if he could tell how far his car traveled from the time when he first became aware of the danger ahead until he turned into the ditch, he said:

"A. No, there would be no way. It was at night. How could you judge? I was looking at the car.

"Q. Well, let's put it this way then: Are you able to tell us approximately what distance there was between your car and the Malecha car at the time that you drove into the ditch?

"A. The only thing I'd say to that is that I was about six hundred, between six and eight hundred feet behind my brother-in-law. Now, evidently when he pulled out he slowed down, and I slowed down when I seen him pull out, so I couldn't give no judgment on that neither."

The value and substance of McCormick's estimate of distance in establishing a fact which might give rise to a jury question must be viewed in proper perspective with all of the evidence relating to the happening of the accident. From the record it appears that on the night of the accident, Dale Malecha had attended a dance, after which he went for a ride with his cousin and a girl friend. The accident happened about 10:30 p. m. At the place of the collision, Highway No. 19 is a straight,

tarred-surface roadway, 24 feet 6 inches in width with a 6-foot shoulder on each side. The pavement was dry and driving conditions were normal. The accident happened in a 50-mile zone. Malecha admitted at the trial that he was traveling about 65 miles an hour at the time of the accident. He told the highway patrolman that he was traveling at a rate of "Sixty, sixty-five, seventy" miles per hour. As he proceeded along the highway, he noticed a car ahead of him but could not estimate the distance. This car was not traveling as fast as he was; he said, "I come up on him in a big hurry." He agrees that the collision with the plaintiffs occurred on the eastbound lane of the highway, or on the wrong lane for the direction he was going.

It appears from the testimony of Albert Ruhland that the Malecha car came into his lane of travel without warning and made contact with the left side of his automobile. Malecha testified that after he veered to the left he "sideswiped the first car, and then immediately the second car hit [him] on the right rear." When McCormick saw the two cars collide on the highway ahead of him, he was traveling at about 50 miles per hour. He said that he immediately slowed down, applied his brakes, and pulled over to the right to avoid what he apparently considered to be an inevitable collision. He said, "I thought the best thing to do would be to go to the ditch." With reference to the interval between the application of his brakes and the collision, he said, "Oh, from the time he hit my brother-in-law until the time he hit me was—there wasn't enough—just a matter of seconds." This testimony is in accord with Malecha's version. Mrs. McCormick testified that her husband turned toward the ditch immediately when he saw the two cars ahead of them make contact.

As further bearing on the time element, it appears that the Malecha car traveled a distance of 77 feet between the two collisions. This was established by the testimony of the highway patrolman and was based upon the location of the debris on the highway caused by the two collisions. In appraising the value of McCormick's estimate of distance, it must first be noted that his statement was qualified. Moreover, it must be viewed realistically in light of all the circumstances relating to the accident and particularly the conditions under which the observation was

made. His testimony as to the distance of 600 to 800 feet between his car and the Ruhland car at the time of the first collision was qualified by his observation that there was no way to definitely determine distance, or, as he put it, "How could you judge?"

It should be conceded that judgment of distance, based upon observation of automobile headlights approaching each other at undetermined speeds in the nighttime, must necessarily rest on sheer conjecture. We agree with the trial court that when the evidence with reference to the estimate of distance falls into place with the other established facts which prove the occurrence of the accident, and is viewed in fair perspective, its probative value vanishes. The evidence relating to the position of the cars on the highway, the admitted rates of speed of the automobiles involved at and immediately before the collision, the time elements involved in the movements of the automobiles which establish that both collisions occurred in a matter of seconds, together with the surrounding physical facts, all belie the claim that a fact question was presented as to plaintiff's contributory negligence.

It is well established that in reviewing the propriety of a directed verdict it is necessary to keep in mind that the motion accepts the view of the evidence most favorable to the adverse party and admits the credibility, except in extreme cases, of the evidence in his favor and all reasonable inferences to be drawn therefrom. The motion for a directed verdict should be granted only in those unequivocal cases where, in the light of the evidence as a whole, it would clearly be the duty of the trial court to set aside a contrary verdict as being manifestly against the entire evidence or where it would be contrary to the law applicable to the case. Grussing v. Binger, 262 Minn. 345, 348, 114 N. W. (2d) 699, 701. In Standafer v. First Nat. Bank, 243 Minn. 442, 68 N. W. (2d) 362, we pointed out that the burden of proving contributory negligence rests on the defendants and it is only when the facts are so conclusive that reasonable men must draw the same conclusion that the question of negligence or contributory negligence becomes one of law. But not every conflict in the evidence gives rise to a jury question, and where as here the evidence so overwhelmingly preponderates in favor of a party as to leave no doubt as to the factual truth and where it would be clearly the

duty of the trial court to set aside a contrary verdict as being manifestly against the entire evidence, a party is entitled to a directed verdict as a matter of law, even though there is some evidence which, if standing alone, would justify a verdict to the contrary. Brulla v. Cassady, 206 Minn. 398, 289 N. W. 404; Kundiger v. Prudential Ins. Co. 219 Minn. 25, 17 N. W. (2d) 49; Applequist v. Oliver Iron Min. Co. 209 Minn. 230, 296 N. W. 13; Hanson v. Homeland Ins. Co. 232 Minn. 403, 45 N. W. (2d) 637; Kath v. Kath, 238 Minn. 120, 55 N. W. (2d) 691, 37 Minn. L. Rev. 389; Giermann v. St. Paul, Minneapolis & Manitoba Ry. Co. 42 Minn. 5, 43 N. W. 483.

■ The defendants next contend that the award for plaintiff Mary McCormick in the sum of $12,000 is excessive. It appears from the record that Mrs. McCormick was 26 years of age at the time of the trial. She was riding in the front seat of her husband's car and was thrown about the automobile in the accident. Her head struck against the windshield, her knees hit the dashboard, and she sustained numerous cuts and bruises. Her physician's notes reflect that she received—

"* * * laceration of right upper arm on the medial aspect; laceration of both kneecap areas. An L-shaped scar of right cheek; multiple abrasions about face; contusion of chest, and other areas of abrasions."

The doctor repaired the lacerations under local anesthesia and on the day following the accident took X-rays which revealed a fracture of the left patella. Her physician testified that—

"* * * her left lower extremity was placed in a cast from approximately the ankle region to the upper thigh region in a straight tubular cast."

The cast remained on her left leg for approximately a month. She was confined to the hospital for 4 days, after which she went to her mother's home and stayed there until the cast was removed. When she returned home, she complained that her knee was weak and that she suffered pain in her knee and back. She consulted an orthopedic surgeon on November 17, 1960, at which time her left knee was swollen, somewhat stiff, and she was unable to straighten it out. The physician found that the thigh muscle was weak and that there was instability of the knee

and a 20-degree limitation in movement. He determined that the under-surface of the kneecap had been damaged and, in order to loosen up its movement, he prescribed physical therapy. He saw her later on December 7, 1960, at which time he determined that she had made good progress and that the physical therapy could be discontinued but that she should keep on doing exercises. He saw her on subsequent occasions when examination confirmed her complaints of increased pain in the knee which prevented her from kneeling. In the examination of her knee he could hear and feel a grating on the inner surface. He concluded that roughness and unevenness of the undersurface of the kneecap was painful and disabling. He testified that there would be permanent disability and said:

"It's my opinion there will be some permanent disability in Mrs. McCormick's left knee.

*   *   *   *   *

"I would anticipate her disability will range between 20 and 25 per cent of the function of the knee."

We are of the view that in Mary McCormick's case she may safely rely on the well-established principle that whether a verdict should be set aside as excessive rests largely in the discretion of the trial court and its action will not be reversed on appeal unless it clearly appears that there was an abuse of discretion. Cameron v. Evans, 241 Minn. 200, 62 N. W. (2d) 793; Larson v. Degner, 248 Minn. 59, 78 N. W. (2d) 333. We are provided with no yardstick which can be applied in passing upon this issue. The particular facts of each case must serve to measure the damages. While the verdict is substantial, we conclude that because of the permanent nature of the injury the trial court did not abuse its discretion in denying a new trial or in not reducing the amount of the verdict.

■   It is next contended by the defendants that the verdict for Patrick McCormick in the sum of $19,169 is excessive and was given under the influence of passion and prejudice. In considering the merits of this claim it is necessary to review the evidence as it bears upon the plaintiff's injuries. At the time of the trial he was 29 years of age, the father of three children, employed in plumbing work as a pipe coverer with an

average weekly take-home pay of $119. He had previously been in good health. As a result of the accident, he sustained lumps on his head and forehead; his chest was struck by the steering wheel; he was unconscious for a period of approximately 10 minutes following the collision; and thereafter his head hurt. From the scene of the accident he went to the New Prague Hospital with his wife where he was examined and released. The pain in his chest lasted for 3 weeks, during which time he complained of pain when he took a deep breath or coughed. About 1 to 2 weeks after the accident he began to have headaches. This condition progressed to the point where he had up to 3 or 4 headaches a day and they would sometimes last 2 or 3 minutes. During this period he complained of dizziness and nausea. At the time of trial he had no trouble with his vision, although he still would get some nausea, but it was not so severe. At the time of trial his headaches continued, but they were not as frequent, occurring 2 or 3 times a week but for longer periods. The headaches manifested themselves by a sharp pain high in his head.

He consulted Dr. Kaiser who sent him to the hospital at Le Sueur for a series of skull X-rays. These X-rays were reviewed by Dr. Sewell Gordon, a radiologist, who reported that there was no evidence of fracture.

In December 1960, the complaints of headaches continued and McCormick was referred to Dr. Robert Stoltz, who specializes in the field of neurology and electroencephalography. It appears that the electroencephalogram is one of a number of recognized tests used in the detection of brain injuries.[1] Dr. Stoltz performed a neurological examination which involved a study of the functions of the patient's brain and spinal cord, a test of vision, strength of muscle groups, sensory responses to pain and temperature, and body reflexes and nerves. As a result of this examination, Dr. Stoltz testified:

"* * * All of these tests were done in completeness, and they were all objectively normal when I first saw him."

---

[1] The electroencephalographic tests are described in our recent decision of Lieberman v. Korsh, 264 Minn. 234, 238, 119 N. W. (2d) 180, 184.

The complaints and physical condition of McCormick are described by Dr. Stoltz in the following statement:

"I saw the patient on February 10, 1961, on March the 10th of 1961, on April the 7th of 1961, on May 22nd, and June the 13th, and on October 30th. The patient during the course of this period of time continued to complain or have symptoms of headaches. On April 18th, for example, the patient indicated that he continued to have headaches in about the same intensity as he previously reported. He also continued to complain of nervous tension. On July 14th, for example, he continued to have these symptoms. On November the 2nd, when I wrote a letter as to the examination of October 30th, he indicated to me at that time that he continued to be bothered by headaches at least twice a week, which I interpreted as being an improvement in the headaches in that they were less frequent. He indicated that the headaches rendered it difficult for him to do his job well, but he was able—he had been able to work all this time. He also continued to complain of nervous tension, which manifested itself in the form of being jittery and nervous.

"The neurological examinations were carried out, as I previously described to you, these special examinations, on each of these occasions, and they were always objectively normal. I was never able to demonstrate anything wrong with the physical examinations. We asked for and he complied with obtaining four more electroencephalograms after the first one."

The first test was interpreted as showing "an abnormality of the brain waves in the form of slow activity, but maximal or more marked from the right side of the brain." The second test, given on February 10, 1961, "revealed a mild to minimal bitemporal slowing." It appears that the term "slowing" refers to "abnormality of the brain waves in the form of slow activity." The third, taken on March 10, 1961, was "normal to borderline abnormal" and "there appeared to be only very minimal amount of slowing present." The test of April 12 was described as "normal to borderline abnormal." The last test given on July 13, 1961, was "within normal limits." It was the doctor's opinion, based upon the electroencephalogram readings, the history of his complaints, and the continuing headaches of which the patient complained, that he suffered

from a "post traumatic brain syndrome, or post traumatic brain injury." It was his opinion that the patient is disabled in the amount of 10 percent of his physical capacity.

In addition to the injuries just referred to, the record establishes that McCormick sustained damage from loss of his wife's services because of the injuries she received in the accident. It is established by the record that Mrs. McCormick was completely disabled for more than 6 weeks, during which time her husband did the housework and cared for the children.

It further appears that McCormick claimed special damages including loss of wages and doctor bills in connection with his own injuries in the sum of $783. Of this sum $354 is claimed as loss of wages. We have carefully examined the record and can find no specific dates on which the plaintiff remained away from work because of the alleged injuries. The record indicates that there were 2 days, one in April of 1960 and one in July, when he did not work because of his injuries. So far as we can find from the record other absence from work may be accounted for by visits to the doctor for examinations and tests. The record establishes that he sustained special damages in the sum of $374.60, including hospital and doctor bills for his wife.

The neurologist who examined McCormick on behalf of the defendants testified that he was unable to find objective neurological symptoms to substantiate the claim of brain damage. He discounted the value of the electroencephalogram tracings. It is not disputed that all the clinical tests, including the electroencephalograms, revealed a normal condition at the time of trial. It further appears that Dr. Stoltz at one time indicated that the headaches would eventually improve and disappear, although at the time of trial he expressed the view that the continuance of headaches for a period of 14 months would indicate a permanent condition.

While it should be assumed that McCormick received one or more severe blows on the head and is entitled to full damages for all injuries he sustained as a result of the defendant's negligence, the fact remains that at the time of the trial all objective tests indicated that his physical condition was normal. From a careful review of the medical interpreta-

tion of the electroencephalographic tests, we are left with the conviction that they are tentative and unsatisfactory in that they failed to provide an explanation for the plaintiff's complaints. They establish nothing more than that at a time prior to trial the patient had a minimal to borderline condition which might be expected from the ordinary brain concussion. But making full allowance for the findings of the electroencephalographic tests, they failed to establish any impairment to the function of the brain or brain cells. In the final analysis the extent of the permanent injuries is based upon the patient's testimony and accordingly must be closely examined. As we noted in our discussion with reference to Mrs. McCormick's verdict, appellate courts are slow to interfere with the determination of the trial court unless it clearly appears that there has been an abuse of discretion. The criteria expressed in some decisions— that the verdict should not be revised unless it shocks the court's sense of justice and the impropriety of allowing the verdict to stand is so manifest as to show a clear abuse of discretion, or unless it is fairly evident that the trial judge failed to keep the jury within the bounds of reason and common sense—do not provide general standards which are easy to apply. In Ahlstrom v. Minneapolis, St. P. & S. S. M. R. Co. 244 Minn. 1, 27, 68 N. W. (2d) 873, 889, we said that "by lack of a definite standard we do not forfeit our recourse to common sense and social practicality in given cases" and that judicial care must be exercised to prevent an unreasonable financial burden to be shifted out of sympathy for the plaintiff. In applying the generally expressed standards for appellate review of damages, we must attempt to realistically appraise the verdict in the light of the evidence in the particular case to determine if the verdict is out of line and whether the trial court manifestly abused its discretion in permitting it to stand.

We are persuaded that the verdict in the case before us is excessive, not only because it rests largely upon subjective evidence, but because the record is without proof of facts which would establish damages in fair relation to the amount allowed. While it is true that the record may support recovery for special damages in the approximate sum of $1,100, and for a fair amount to compensate for recovery of loss of his wife's services and damages for pain and suffering, it is difficult to justify the

sum of $19,169 as commensurate with the damages proved. There is no evidence that the plaintiff's earning capacity has been impaired. His injuries never required hospitalization. While he took off a number of days from work for medical examinations, the record establishes that he lost no more than 2 days of work because he did not feel well. We are accordingly of the view that the verdict is excessive and should be reduced to the sum of $15,000.

■ Other errors raised by the defendants deserve but brief comment. In a persuasive final argument to the jury plaintiffs' counsel staked his reputation as a lawyer upon the veracity of his clients' testimony. We agree that an attorney should not attempt to endow his clients' cause with the merits of his personal standing in the community. In light of the record, however, we do not think that the conduct complained of was such as to demand a new trial. The defendants further contend that the trial court unnecessarily referred to the subject of insurance in the charge to the jury. It is unnecessary to extend this opinion by going into the details of how this occurred. It is sufficient to say that the court might well have refrained from making such reference, but as we view the record, it does not seem to us that it constituted prejudicial error. From an examination of the record as a whole we are of the view that the size of the verdict may be attributed to the fact that the jury placed too much importance on the evidence relating to the electroencephalographic tests.

The order in the Mary McCormick case is affirmed. The verdict in the Patrick McCormick case is set aside and a new trial granted unless within 10 days after the filing of this opinion, the plaintiff shall file a written consent to the reduction of the verdict to the sum of $15,000. If such consent is so filed, the verdict as reduced will stand and the order denying a new trial will be affirmed.

Affirmed as to plaintiff Mary McCormick. Reversed and new trial granted as to plaintiff Patrick McCormick, unless he consents to reduced verdict.

Rogosheske, Justice (dissenting).

I agree that the verdict for Patrick McCormick is excessive, but I can-

not agree that it was not given under the influence of passion and prejudice.

In a trial of this kind, the cumulative effect of a final argument containing not only the acknowledged improprieties referred to, but also an invitation to jurors to award an amount they would believe adequate if they were the injured party and repeated disavowals of a desire to punish defendants to the point where the opposite inference may be suggested coupled with the court's unrequested and unwarranted admonition concerning the existence of insurance, cannot, I submit, be regarded as nonprejudicial error. Moreover, at the very least, I believe that the lack of evidentiary support for the verdict, and the unfairness occasioned by the errors in the argument and charge, could only be adjusted, if at all, by a trial court remittitur. Although there is precedent for it, I question the wisdom of encouraging a trial court's refusal to reduce an excessive verdict in a case of this kind by granting a remittitur at the appellate level. With all deference, I would grant a new trial on the issue of damages.

OTIS, JUSTICE (dissenting).

I agree with the dissent of Mr. Justice Rogosheske.