**Vernoyd I. KELLER, Appellee,**

**v.**

**The ORION INSURANCE COMPANY, Limited, of London, England, Appellant.**

**No. 19703.**

United States Court of Appeals, Eighth Circuit.

March 23, 1970.

Rehearing Denied April 28, 1970.

R. D. Blanchard, of Meagher, Geer, Markham & Anderson, Minneapolis, Minn., for appellant; O. C. Adamson, II, Minneapolis, Minn., on the brief.

Walter W. Laidlaw, Minnetonka Village, Minn., for appellee; John J. Doherty, Minneapolis, Minn., on the brief.

Before GIBSON, LAY and BRIGHT, Circuit Judges.

BRIGHT, Circuit Judge.

An insurer which wrote an occupational disability policy covering an airline pilot appeals from an adverse judgment entered upon a jury award in favor of the insured pilot for $25,000.00, the face amount of the policy. Minnesota substantive law governs this diversity action.

The insuring agreement, in part, provided for payment should the insured "contract any sickness or disease, including natural deterioration * * * which shall result in the Insured being permanently prevented from carrying on his occupation * * *" during the effective period of the policy, commencing December 1, 1960. The parties here agree that Vernoyd I. Keller, the insured pilot, suffered permanent occupational disability as a result of a progressive mental illness. The trial court presented the jury with the factual issue of whether Keller contracted the disabling mental illness before or after the inception date of the policy. Appellant here contends that the evidence establishes as a matter of law that such mental illness antedated the inception of the policy, and the trial court erred in submitting that matter to the jury and in denying defendant's postverdict motion for judgment n. o. v.

We reject appellant's contention and affirm.

We review the evidence within the framework of the trial court's instruction to the jury:

"* * * [A] sickness or disease is deemed to have its inception [i. e., contracted] at the time that it first manifested itself or became active, or became reasonably apparent, or when sufficient symptoms existed to allow a reasonably accurate diagnosis of the sickness or disease."

Plaintiff Keller commenced flying as a pilot for Northwest Airlines in 1942, at the age of twenty-three, and he followed his calling continuously, briefly as a copilot and later as a captain, until grounded in the spring of 1961. During the intervening years, Keller fulfilled all requirements, both physical and technical, to merit continuance of his transport pilot license and rating.

The testimony discloses that as early as 1956, Keller regularly obtained a wide variety of ataractic and other drugs— mood elevators, sleeping pills and the like—to ease emotional tensions which the plaintiff primarily related to an unhappy home environment stemming from a deteriorating marital relationship with his second wife. Keller's medical history since 1956 also disclosed sundry somatic-type complaints such as nervousness, insomnia, tenseness and fatigue. Concern over their continuance prompted Dr. Milton Seifert, Jr., one of plaintiff's physicians, to refer Keller to Dr. John J. Regan, a qualified psychiatrist. Dr. Regan, in examining Keller on October 21, 1960, gained the impression that the patient exhibited a severe compulsive-type personality, that he then suffered from reactive depression and that he had been utilizing excessive quantities of drugs.

Dr. Regan testified that on that date he advised the patient to commence psycho-therapy treatments and to either quit taking drugs or quit flying. During the month of October, 1960, Keller occupied reserve flying status, being called upon to fly only when a regularly-scheduled pilot was unable to make a particular flight.

The plaintiff failed to return for the recommended psycho-therapy. He did, however, return to a regular flying schedule during November and December of 1960. In early January of 1961, an illness described as the "flu" required Keller to be hospitalized. Dr. Regan, as a consultant called by the attending physician, diagnosed Keller as suffering from depression. He administered six electro-shock therapy treatments during the course of Keller's hospitalization. Dr. Regan regarded those treatments as successful.

An airline strike prevented Keller's immediate return to flying status after his release from the hospital. At the conclusion of the labor dispute about March 1, 1961, he advised Northwest of his desire to return to flight duty. He thereafter demonstrated the necessary technical qualification by passing simulated flight and proficiency tests. However, in early May, Northwest Airlines, on hearing a rumor concerning Keller's earlier psychiatric problems, requested that he undergo a medical examination at the Mayo Clinic at Rochester, Minnesota.

Indeed, earlier, on October 21, 1960, the same day that Dr. Regan found Keller depressed and in need of psychotherapy, Mayo's specialist, Dr. Jan H. Tillisch, had examined Keller at the employer's request and found him well and "acceptable as a transport pilot". However, after the May, 1961 medical examination which included a complete physical and psychiatric workup, Mayo physicians recommended that Keller cease flying. They found his physical condition to be essentially normal, but noted that he possessed "a markedly neurotic personality". In making a recommendation, they also considered Keller's history of using ataractic drugs and his earlier depression as it had been described to them by Dr. Regan. Accordingly, Northwest Airlines grounded Keller—first temporarily, later permanently.

Dr. Robert Cranston, a qualified Minneapolis neurologist and psychiatrist, treated Keller subsequent to February 27, 1961. On his first examination, he diagnosed Keller as being temporarily depressed and in need of treatment. Keller, however, failed to respond to Dr. Cranston's therapy. His condition thereafter deteriorated to one of permanent and total occupational disability.

■ The record as a whole denotes Keller as a person with an obsessive-compulsive personality, as a person whose difficulties in adjusting to stresses arising out of an unfavorable home life and an exacting occupation eventually resulted in the impairment of his ability to function as a pilot. The medical evidence indicates that Keller's personality weaknesses, which probably developed at an early age, underpinned his eventual mental breakdown. Of course, the mere presence of such pre-existing weakness would not bar recovery under a disability policy. See Smith v. Benefit Association of Railway Employees, 187 Minn. 202, 244 N.W. 817 (1932); Cohen v. North American Life & Casualty Co., 150 Minn. 507, 185 N.W. 939 (1921). Neither would recovery be precluded because of periods of transient depression from which Keller recovered prior to the effective date of the policy. See and compare World Insurance Co. of Omaha, Nebraska v. Pipes, 255 F.2d 464, 470–472 (5th Cir. 1958); State Mutual Life Assurance Co. of Worcester, Mass. v. Heine, 141 F.2d 741, 745–746 (6th Cir. 1944). No clear delineation marks the boundary between demonstrated peculiarities of personality and similar manifestations of mental illness.

■ In the collage of facts and medical opinion presented in this case, a fact finder might weigh Dr. Regan's diagnosis of mental illness on October 21, 1960, against Dr. Tillisch's clearing of Keller for further flying duty on that same day. Keller's history of using tranquilizers and similar drugs to relieve tenseness, fatigue and nervousness may be evaluated in light of general knowledge that such symptoms are often concomitants of pressures generated in performing an exacting, responsible occupation and in coping with the complexities of rapidly changing modern society.

Appellant proposes that no inconsistency exists in Mayo's negative report of October 21, 1960, and Dr. Regan's coincident diagnosis of depression, since the former dealt with physical well-being, the latter with the psyche. Such inconsistency, or lack of it, falls within the fact finder's province governing weight, credibility and inferences attributable to the testimony. See Imperial Casualty & Indemnity Co. v. Carolina Casualty In-

surance Co., 402 F.2d 41, 44 (8th Cir. 1968); Minnesota Mutual Life Insurance Co. v. Wright, 312 F.2d 655, 659 (8th Cir. 1963).

Reviewing the evidence in the light most favorable to the verdict, resolving all conflicts and drawing all reasonable inferences in favor of the prevailing party as we are required to do, see Meitz v. Garrison, 413 F.2d 895, 896 (8th Cir. 1969), we find no proper basis on which to set aside the jury verdict.[1]

Affirmed.

---

1. We arrive at our result upon application of either the federal substantial evidence test or its equivalent under Minnesota law. See State Farm Mutual Automobile Insurance Co. v. Borg, 396 F.2d 740, 742 (8th Cir. 1968); O'Hare v. Merck & Co., 381 F.2d 286, 288–289 (8th Cir. 1967); Downey v. Frey, 269 Minn. 66, 130 N.W. 2d 349 (1964); McCormick v. Malecha, 266 Minn. 33, 122 N.W.2d 446 (1963).