## R. J. JANICKE AND OTHERS v. HILLTOP FARM FEED COMPANY.[1]

November 16, 1951.

No. 35,369.

[1]Reported in 50 N. W. (2d) 84.

136

*Frank J. Collins* and *John Ott,* for appellant.
*Bowen & Bowen,* for respondents.

LORING, CHIEF JUSTICE.

In an action brought to recover damages for breach of contract, the jury returned a verdict in favor of plaintiffs. Defendant appeals from the order denying its motion for a new trial.

In August 1946, defendant, Hilltop Farm Feed Company of Minneapolis, was the owner of an elevator and feed-mill plant at Douglas, Minnesota. The buildings were on land leased from a railroad company. There were trackage facilities. The plant had the benefit of transit privileges. This allowed it to stop a car in transit, remove the contents, put it in the elevator, at some later day grind it, put it back in the car, and ship it on to Minneapolis or whatever point the destination would be, without any additional freight charges. The straight freight rate would apply all the way through. Prior to the above date, plaintiffs Charles J. Mander and R. J. Janicke had for several years been employed by the Northern Pump Company of Minneapolis. Between them they had saved about $11,000 and wanted to get into a suitable business. They got in communication with one Robert E. Lewis, who was connected with The Locators, Incorporated, a firm of business brokers. Defendant company had listed with it for sale the elevator and feed-mill plant at Douglas. Lewis told them about it, and one of Lewis's salesmen took them to Douglas to look it over. Neither Mander, Janicke, nor Lewis knew anything about the grinding business, but the plant and its possibilities appealed to them; and on August 8, 1946, Mander and Janicke signed an earnest money contract to purchase the property for $16,500, to be paid on or before August 20, 1946. At that time they deposited $100 as part of the purchase price. As Mander

and Janicke had only $11,000 between them, it was contemplated that the balance of $5,500 would be financed through a bank or some individual. An application was made to a bank, which refused to make the loan. Lewis then spoke to Frank E. Moore, the president of defendant, and told him that Mander and Janicke were unable to get the necessary financing and that the deal was off. Moore suggested that Lewis take an interest in the deal. Of the $16,500 called for in the earnest money contract, the net price to Moore was to be $15,000, and the balance of $1,500 was to be the commission to Lewis. In the conversation above referred to, Moore said that he would reduce his price from $15,000 net to him to $13,000, which meant that a one-third interest would cost Lewis $2,000. Mander and Janicke would still continue to pay $11,000. This proposition constituted an entirely new deal. Inventory of the supplies, grain, and merchandise on hand was to be paid for in addition and would be carried on an open account basis. Lewis testified that Moore said:

"* * * the local business that he would turn over would more than pay the operating expenses of the business, including the salaries of Mander and Janicke and Dreier [the superintendent] and such other help that they would have to hire."

Lewis also testified that Moore said that—

"this plant would serve as a processing plant for the Hilltop Farm Feed Company of Minneapolis and would grind corn for the Hilltop Company. That he would furnish the corn and that the milling company would receive $4.50 a ton, which was the then going rate, of grinding corn, and that there would be income from two to three cars a week, and perhaps up to seven cars a week. He [Moore] would keep that plant busy grinding corn, processing for the Hilltop Farm Feed Company, that there would be in that season a minimum of 100 cars to be processed."

Lewis figured out roughly that that would be $180 a car and at least $18,000 worth of net profit earned at the plant, and that he (Lewis) could well afford to take an interest in the business even

though Mander and Janicke would be drawing $7,000 a year. In that conversation it was agreed that the original deal was off. Moore wanted his money all in cash as soon as he could get it. Mander and Janicke agreed to take Lewis in as a partner. Lewis was to have nothing to do with the operation of the plant. The three men went back to Moore's office the same week and told him that it was agreeable to Mander and Janicke that Lewis go in with them. At that time Moore, according to Lewis's testimony, again stated that the local business he would turn over would more than pay expenses, including the expense of the grinding of corn for defendant, that it was profitable, and that he would give them a minimum of two to three cars a week during the next grinding season, and as many as seven if they could get them out. He said that there would be at least 100 cars which they would get, and that they would make a net profit in excess of $20,000 a year. He said that from then on they would have enough money so that they could handle it on their own.

The three men went to an attorney's office and made arrangements for the incorporation of the business. One hundred sixty-five shares were issued, each taking a third. Lewis's shares were issued to his sister, Ann H. Goodwin, one of the plaintiffs. August 16 or 17, 1946, Janicke paid down $2,300. At that time there was a repetition of former conversations already related. Both Lewis and Janicke testified that Moore said he thought that Dreier, the superintendent, should be retained. On Monday, August 19, the three men again went to Moore's office. Each gave Moore his check to pay his share in full. A bill of sale was executed at that time.

Plaintiffs commenced operating the plant the next day. It proved to be an unsuccessful venture. The local business was negligible. In the whole period of operation, defendant sent only one car of corn to be ground. Operations ceased on the last of March 1947. Up to that time, according to plaintiffs' testimony, the net loss amounted to $4,716.10. The liquidation of the business was completed on May 2, 1947. Plaintiffs assert that they suffered a

total net loss of $6,519.15 from the operation of the business, and brought this action.

Plaintiffs sought recovery for breach of the contract with defendant in three respects: (1) For failure to turn over to plaintiffs the local business as promised; (2) for failure to send two to three cars of corn a week to be ground at the agreed price of $4.50 a ton; (3) for failure to send them 100 cars of corn to be ground during the grinding season. Since no recovery could be had on the third ground for the reason that the grinding season had not ended when plaintiffs closed the plant, we need not give that phase of the case further consideration; nor need we consider the first ground, for the reason that the evidence was such that no more than nominal damages could be sustained. So we consider the question whether the verdict can be sustained on the second ground.

Defendant denies that in the sale of the property it made any agreement to have plaintiffs grind any corn for it. The court instructed the jury to determine from the evidence the terms of the contract entered into between these parties, as follows:

"* * * If the contract was as claimed by the defendant there has admittedly been no breach thereof and there could be no recovery by the plaintiffs. If the contract was as claimed by the plaintiffs, or even partially, then just as clearly there has been a breach thereof, * * *."

The court instructed that if a breach had occurred interest should be added from the date of such breach. The jury returned a verdict for plaintiffs "in the sum of eleven thousand five hundred and twenty-one dollars ($11,521.00) with interest at 6% per annum on eleven thousand five hundred twenty dollars ($11,520.00) from May 2, 1947." An analysis of the verdict indicates that the jury allowed the nominal sum of one dollar for breach of the contract involving local business and $11,520 for breach of what we may call the corn-grinding contract.

The principal question presented is whether, as defendant contends, the verdict is a perverse and a compromise verdict. Defendant contends that there is no evidence in the case to support a

verdict of $11,520 with interest for breach of the claimed corn-grinding contract. As heretofore stated, the claimed breach must rest on the fact that defendant failed to deliver at least two or three cars a week for transit grinding. Plaintiffs call attention to the fact that the period during which they were operating, which ended on March 31, 1947, was exactly 32 weeks. Thirty-two weeks at two carloads a week would total 64 cars. Sixty-four cars of 40 tons' capacity, processed at an agreed price of $4.50 per ton, would call for a payment of $180 a car, or a total of $11,520, the amount of the verdict. Without further analysis of the testimony, it would appear that the verdict was properly arrived at under the instructions of the court and the evidence. If the grinding season began when the transaction was concluded and continued until plaintiffs closed down the plant, the verdict is sustained and is not perverse or the result of compromise.

The contract, as testified to by plaintiffs, was in part that defendant would give them a minimum of two or three cars a week for transit grinding during the next grinding season. The court in its instructions to the jury referred to the "next grinding season" as follows:

"* * * during the next grinding season, which the undisputed evidence indicates was from approximately the time of the transaction until May or June of the next year, 1947."

No exception was taken by defendant to this charge, either at the trial or in the motion for new trial; it was not assigned as error here, nor could it have been; and it was not challenged in defendant's brief or on oral argument. It is therefore a conceded fact that the grinding season here under consideration commenced at or about August 19, 1946, and continued until May or June 1947; and this regardless of the question whether there was sufficient evidence to sustain the court's charge. In State v. Sprague, 201 Minn. 415, 419, 276 N. W. 744, 746, this court said, with reference to a charge in regard to which it was contended on appeal that there was a lack of evidence to support a certain finding:

"* * * And if instructions are given with regard to an issue where there is little or no evidence to support a finding on that issue, if the lack of evidence is not brought to the attention of the trial court before the jury retires no error is presented for consideration on appeal."

A situation somewhat like that in the case at bar arose in Nelson v. C. M. & St. P. Ry. Co. 139 Minn. 52, 55, 165 N. W. 866, 867, where the court charged that it was not disputed that defendant was negligent, and the defendant took no exception to the charge, but attempted to raise the question on appeal under a claim that there was no evidence in the record of negligence on its part. This court said:

"This charge completely eliminated the issue of negligence on the part of defendant, and we think that, under the circumstances, if defendant did not concede its negligence, *counsel should have so informed the court by proper exception at the trial.* Not having done so, it should not now, for the first time, raise that question." (Italics supplied.)

We think that the same rule should apply here, since defendant took no exceptions to any of the court's instructions, either at the trial or on its motion for a new trial. It does not and could not here assign any error based thereon. In fact, one of the grounds for its motion for new trial was "That the verdict of the jury is contrary to the instruction of the court."

With the record in that condition, we must regard the statement by the court as to the commencement of the grinding season as a conceded fact. Such being the case, there is abundant evidence in the record to sustain the $11,520 in damages for the breach of contract. The additional one dollar may be sustained as nominal damages for breach of the contract in regard to local business, since there was no evidence upon which substantial damages could be calculated. The jury not only rendered a verdict sustained by the evidence, but showed discernment in a somewhat complicated case.

Defendant in its motion for new trial challenged the verdict

on the ground of prejudicial remarks and misconduct on the part of plaintiffs' counsel in his closing argument to the jury and in the cross-examination of Frank E. Moore, defendant's principal witness. As to the cross-examination, defendant's sole objection on the trial was that the line of questioning was immaterial, and the court sustained the objection. There was no further motion or objection made as to that, nor was there any objection made or exception taken during the closing argument of plaintiffs' counsel or at the close thereof. Under such circumstances, to entitle defendant to a review of those questions here the conduct of counsel must have been so reprehensible as to require the action of the court on its own motion. We do not so regard the alleged misconduct in this case.

Order affirmed.

MR. JUSTICE THOMAS GALLAGHER took no part in the consideration or decision of this case.

