HARDWARE MUTUAL CASUALTY COMPANY and another, Respondents, v. HARRY CROW & SON, INC., and another, Appellants.

*January 9—February 3, 1959.*

398

400

For the appellants there was a brief by *Heft & Coates* of Racine, and oral argument by *Carroll R. Heft.*

For the respondents there was a brief by *Cavanagh, Mittelstaed, Sheldon, Heide & Hartley* of Kenosha, and oral argument by *William A. Sheldon.*

FAIRCHILD, J.  Defendants assert that the record will not sustain the jury finding that Orr was negligent, that the damage awards were excessive, and that there were several prejudicial errors upon the trial. Upon our review of the record, we reach the conclusion that defendants' challenges are not well founded and that the judgment is to be affirmed.

1. *Findings of negligence.* It was conceded that Huber never saw the truck. The jury found that his failure to see it was negligence as to lookout and attributed 15 per cent of the total negligence to him. Orr testified that he saw Huber at all material times and the circuit court declined to submit any question as to lack of lookout on Orr's part, although in its opinion on motions after verdict, the court indicated some misgivings about not having submitted that issue. As we understand Orr's claim, it was that Huber would not have been hit by the truck except for a sudden movement backward into its path and that this unanticipated movement occurred when the truck was so close to Huber that there was insufficient time or space in which to stop the truck or divert it before it struck Huber. The claim of Huber, as we understand it, was that he was standing still or, if moving at all, was moving forward which would be away from danger from the truck. It would follow that if Huber was at all times at least as much in the path of the truck as he was when he was struck, Orr's version is not correct and Orr must have continued to back the truck toward Huber in reliance upon Huber's stepping out of danger. The location of the accident was not a highway but

a place where both the electricians and Orr were engaged in the work which they were called upon to perform. It seems to us, as it did to the circuit court, that the evidence presented a jury question as to Orr's negligence with respect to management and control.

2. *The award of $7,500 for personal injuries.* Huber described the pain while the wheel of the truck was upon his leg as the most-terrific pain in his life. No bone was fractured in his leg, but he described it as smashed flat and just about the thickness of his two hands. His left arm was broken at the elbow. He was in the hospital eleven days and there was a cast on his left elbow for three weeks. Tread marks of the truck tire were imbedded in his leg for about two and one-half months. His leg remained discolored until after March 1, 1956. As will appear elsewhere, he was unable to perform his normal work. Up to the time of trial, February 6, 1958, his right leg would swell after he had worked about six hours and it would ache. His left elbow still gave him trouble in some positions. Sharp pain would shoot up his arm when turned and it was not as strong as it had been nor as strong as the other arm. His doctor was of the opinion that Huber had a five per cent permanent disability at his left elbow. The doctor also gave the opinion that if Huber's testimony as to swelling and soreness is true, such swelling and soreness were the result of the accident. The trial judge who observed Huber and heard the testimony was of the opinion that the allowance of $7,500 "may be high but it is not excessive and it does not show prejudice." The judge commented in his decision that Huber must have suffered agony while the heavily loaded truck backed onto his leg and remained there for approximately a minute. The trial judge reasoned that in view of the pain and suffering and the agony of the accident itself, $5,000 would not be excessive for the leg injury and $2,500 would

not be excessive for the permanent disability in the elbow. We are not prepared to say that the award is excessive, it having been approved by the trial judge.

3. *Impairment of earning capacity.* Huber returned to work for his employer, Magaw Electric Company, August 29, 1955. His doctor requested that he be given lighter work. He did not do his regular work, but swept floors and did cleaning. He was unable to climb ladders or support heavy things in his hands and both those abilities were needed in his work as an electrician on construction jobs. He was laid off by Magaw at Kenosha on November 8th. He worked for the same company at Racine from November 15th to December 6th. He was unable to climb or lift and was again laid off. Shortly before Christmas, 1955, he began to work as a maintenance electrician at Nash and continued in that job until about March 1st. He then left because he was transferred to the midnight shift and this job would involve doing "change-over light construction" for a part of the shift. He testified that he was not then able to do the same kind of work he had been doing before the injury because he could not climb and could not lift. He then worked as a clerk in a store until September 20, 1957, when he began to work again as a construction electrician.

Huber had worked for Magaw for five weeks prior to his injury. His base pay without overtime was $123 a week, but in most of those weeks there had been enough overtime so that his compensation during those weeks averaged $149.13. His compensation at Magaw after returning to work averaged $109.50 and his average compensation during all the weeks he worked for Magaw both before and after the injury was $121 per week. His average earnings at Nash were approximately $129 per week. If Huber's average earnings at Magaw ($149) for the five weeks prior to injury were accepted as a measure of his earning capacity

prior to injury, the difference between his actual earnings after the injury and until September, 1957, and the amount he could have earned would be approximately $8,500. On the other hand, if defendants' contention were accepted, the measure of Huber's earning capacity would be $121 per week and the total difference up to September, 1957, would be approximately $6,000. Either calculation would sustain the $4,000 awarded by the jury.

Defendants also claim that it was not shown that Huber's injury prevented him from continuing to earn $129 per week at Nash rather than the $65 or $75 he earned as a clerk in a store. Huber testified that in order to continue at Nash, he would have been required to do "change-over light construction" and that he was then unable to do his regular work because he could not climb and could not lift. It is not crystal clear that his testimony meant that he was unable to perform the light construction work, but neither defense nor plaintiffs' counsel asked for more-specific testimony. In view of the testimony as to the difficulties Huber was still having with his leg and arm and the fact that Huber took a severe reduction in income in changing to a clerk's job, we think the jury could legitimately conclude that Huber left Nash because of disability rather than a personal choice not to work the midnight shift.

4. *Submission of a question on emergency.* Defendants requested that the special verdict include a question inquiring whether Orr was confronted by an emergency not brought about by his own negligence. The trial court declined to submit this question, but in its instructions did call attention to Orr's claim that he was confronted by an emergency when Huber suddenly stepped backward and set forth the emergency rule. In effect the emergency rule defines a standard of due care which the jury is to apply to the conduct of an actor who is confronted by an emergency not brought about

by his own negligence. A jury's determination that such an emergency occurred is but an intermediate step in determining whether the actor was negligent. We can see no reason why defendants were entitled to the submission of a separate question on the intermediate step. They do not claim any inadequacy in the instruction given nor in the question submitted as to Orr's negligence.

5. *Instruction on federal income tax*. Defendants requested that the jury be instructed that when it had arrived at the amount of its verdict, it should not add any sum of money to that amount for federal income taxes and that as a matter of law the amount awarded to the plaintiff by the verdict is exempt from federal taxation. The trial court declined to give the instruction and on motions after verdict stated in its opinion that in any event the omission of such instruction would be within the discretion of the trial judge and that refusal of it was not prejudicial error.

Defendants' argument appears to have two branches, one with respect to the award for the aspects of the injury other than earning capacity, and a second with respect to the award for past impairment of earning capacity. We will discuss them separately.

(a) *Award for personal injury*. Defendants argue that a jury may conclude that a plaintiff should receive a certain amount, may believe (erroneously) that plaintiff will be required to include the award in his taxable income, and may add something to the award to offset the tax. To prevent those possibilities, defendants argue that there should be an instruction that plaintiff will not have to pay income tax on the award.

Defendants' reasoning is the same as that of the supreme court of Missouri in *Dempsey v. Thompson* (1952), 363 Mo. 339, 251 S. W. (2d) 42, 45. That court decided not to reverse the trial court because of failure to give an instruc-

tion on this matter, but announced that in the future the instruction should be given in similar cases. The court said (p. 346), "It is reasonable to assume the average juror would believe the award involved in this case to be subject to such taxes."

Other courts have felt that the erroneous belief on the part of jurors was less probable and that it was better judgment not to introduce the subject of income taxation. In *Briggs v. Chicago Great Western R. Co.* (1957), 248 Minn. 418, 431, 80 N. W. (2d) 625, 635, in declining to follow *Dempsey v. Thompson,* the supreme court of Minnesota said: "The majority rule is to the contrary and we adopt it as more in accord with sound judicial administration. The injection of the question of income-tax liability is likely to give rise to more problems than it would solve."

Similar comments appeared in *Combs v. Chicago, St. P., M. & O. R. Co.* (D. C. Iowa, 1955), 135 Fed. Supp. 750, 757, *Maus v. New York, C. & St. L. R. Co.* (Ohio App. 1955), 128 N. E. (2d) 166, and *Hall v. Chicago & N. W. R. Co.* (1955), 5 Ill. (2d) 135, 125 N. E. (2d) 77, 86.

(b) *Award for lost earnings.* Defendants suggest that since the earnings Huber would have received, had he not been injured, would have been subject to income tax and since the award will not be subject to income tax, the jury should be instructed accordingly so that it will make an appropriate reduction in the amount. Defendants rely upon a decision of the English House of Lords. *British Transport Comm. v. Gourley* (1956), A. C. Law Rep. 185. There an injured plaintiff had been awarded 37,720 pounds sterling as damages for actual and prospective loss of earnings. This award did not take into account any tax the plaintiff would have had to pay on the amount of earnings if he had not been injured. The trial court found that if the earnings were reduced by the probable tax, the award would be 6,695 pounds

sterling. It was decided on appeal that the reduced amount was the correct award.

One of the judges dissented, saying (pp. 217, 218), "It is, of course, obvious that if the injured man had been able to work he would have paid tax on his earnings, and it is attractive to say that his damages for ascertained loss of earnings should be calculated on net earnings after deduction of tax. But if an award of damages for loss of earnings is not subject to tax, to deduct tax before assessing damages seems to me singularly like exercising taxing powers in an indirect way. . . . If there is a case for thinking that assessing damages on a basis of gross earnings in actions for personal injuries, or for wrongful dismissal, enables the individual to escape his fair contribution to the national revenue, the position, in my opinion, should be rectified by legislation."

The supreme court of Illinois followed similar reasoning in the *Hall Case, supra*. It said (5 Ill. (2d) 151, 125 N. E. (2d) 86) : "It is a general principle of law that in the trial of a lawsuit the status of the parties is immaterial. Thus, what the plaintiff does with an award, or how the defendant acquires the money with which to pay the award, is of no concern to the court or jury. Similarly, whether the plaintiff has to pay a tax on the award is a matter that concerns only the plaintiff and the government. The tort-feasor has no interest in such question. And if the jury were to mitigate the damages of the plaintiff by reason of the income-tax exemption accorded him, then the very congressional intent of the income tax law to give an injured party a tax benefit would be nullified."

Upon the present record, we do not feel called upon to decide whether any type of instruction dealing with the income-tax matter could properly be given in a similar case, but we agree with the supreme court of Illinois that the award for

loss of earnings should not be reduced by reason of its free-dom from income tax and accordingly that it was not error to refuse to give the requested instruction in the present case.

6. *Lack of a question as to the negligence of a third party.* Defendants contend that there was evidence which would support a finding that Mr. Pietrangeli, the foreman for the general contractor, was negligent and that such negligence contributed to the accident. The argument is that Pietrangeli was directing the trucks as to when and where to back, that there is some evidence that he gave a signal to Orr to back up at the time he did, and that Pietrangeli did not signal the truck to stop, and did not give warning to Huber. Defend-ants contend that the jury might have found causal negli-gence and therefore the verdict should have contained appropriate questions so that the percentage of causal negli-gence attributable to Pietrangeli could have been determined.

In similar situations this court has held that the omission of questions as to the negligence of third parties is not preju-dicial to one in the position of defendants here because, assuming the same relative comparison between the parties involved in the lawsuit, the only effect of attributing negli-gence to the third party would be to make the defendants liable for a higher percentage of the total damage. *Patterson v. Edgerton Sand & Gravel Co.* (1938), 227 Wis. 11, 22, 277 N. W. 636; *Ross v. Koberstein* (1936), 220 Wis. 73, 74, 264 N. W. 642.

7. *Conduct of counsel.* Defendants moved for a mistrial and later for a new trial on the grounds of misconduct of plaintiffs' counsel. The first ground was that plaintiffs' coun-sel at the close of his evidence made a motion to amend the complaint by increasing the amount in the *ad damnum* clause as well as in one other respect. This motion to amend and the motion for mistrial were argued in the absence of the jury. The court granted the amendment with respect to

the prayer for relief and defendants' counsel asked that upon reconvening court, the court instruct the jury that plaintiffs' request for amendment was not evidence. The court did so. In the decision on motions after verdict the court stated that although the motion was made while the jury was present, it was not made with special reference by voice or gesture to the jury. We cannot say that any possible prejudicial effect of the motion being made in the hearing of the jury was not sufficiently removed by the instruction. The other claimed misconduct was a remark of plaintiffs' counsel in closing argument, not included in the transcript but summarized in the bill of exceptions as a statement to the effect that defense counsel would not have placed his leg under the truck wheel for any amount of money. The court's decision recites that this remark was stopped by a prompt sustaining of the objection and we have no reason to suppose that such disposition of the matter was inadequate. In *Larson v. Hanson* (1932), 207 Wis. 485, 489, 242 N. W. 184, cited by defendants, it was the trial court which granted a new trial because a high award showed that the jury did not heed a warning to disregard a similar remark.

8. *Comment on interest of compensation insurer.* Defendants' counsel attempted to include in his argument to the jury reference to the amounts which the plaintiff compensation insurer had paid to plaintiff Huber. Objection was sustained. Before the trial court the defense counsel stated, "This argument was intended merely to give the jury a guide by which the jury could arrive at a fair amount in the verdict." There was a colloquy in chambers in which defense counsel recited that at the time of the opening of the case, he had not been permitted to mention anything relative to the compensation insurer and therefore he moved that in the final submission no mention be made by any attorney of any insurance. The court said, "It is understood there will be

no discussion or mention of insurance in the arguments and that is by agreement of both counsel outside of the presence of the jury." In its decision the trial court commented that there had been agreement by counsel that there would be no argument on the matter of insurance. Before this court, defendants cited decisions to the effect that they were entitled to show the interest of an employer in the outcome of the trial. In any event, it appears to us that the trial court quite properly interpreted the agreement of counsel as excluding references to the amount of compensation paid by the insurer and made his ruling in accordance with the agreement. Secondly, the suggestion made to the trial court that the amount of compensation paid would serve as a guide to the jury in awarding damages is not well taken. The amount of compensation for which an employer may be liable to his employee under the Workmen's Compensation Act is not relevant to the amount of damages properly awardable for the same injury in a tort action at law. Finally, the cases relied upon by defendants upholding the right to show the employer's interest in the result reached in a third-party action brought under the Workmen's Compensation Act are not in point here. They are *Johannsen v. Peter P. Woboril, Inc.* (1952), 260 Wis. 341, 346, 51 N. W. (2d) 53, and *Pedek v. Wegemann* (1957), 275 Wis. 57, 81 N. W. (2d) 49. In those cases employees of the interested employer testified. It was held that the interest of the plaintiff employer "goes to the credibility of its employees who appeared as witnesses." Here the compensation insurer was the plaintiff and none of its employees were witnesses.

*By the Court.*—Judgment affirmed.