Daniel W. HAKE, Respondent,

v.

SOO LINE RAILWAY COMPANY,
Appellant.

No. 46602.

Supreme Court of Minnesota.

Sept. 9, 1977.

Patrick J. McPartland, Minneapolis, for appellant.

MacDonald & Munger, John G. Fillenworth and A. Blake MacDonald, Duluth, for respondent.

Heard before ROGOSHESKE, PETERSON, and KELLY, JJ., and considered and decided by the court en banc.

PETERSON, Justice.

Plaintiff, Daniel W. Hake, was employed as a laborer by Farmers Union Grain Terminal Association (FUGTA) in Superior, Wisconsin. He sustained personal injuries on July 20, 1973, when the 460-pound door of Soo Line Railroad Car No. 44558, which he was attempting to close, fell off and struck him, crushing his knee. Defendant, Soo Line Railway Company, owned the boxcar which was delivered to FUGTA to be emptied of grain carried from Fredonia, North Dakota, and filled with bulk wheat destined for Mechanicsburg, Pennsylvania. Plaintiff instituted this action for damages against defendant on the theory that defendant negligently performed its duty of inspection to determine that the car was reasonably safe for unloading and loading by FUGTA. The jury by special verdict found defendant 100-percent causally negligent and assessed plaintiff's damages in the sum of $103,300.

Defendant appeals from the judgment entered upon that verdict and from the order denying its post-trial motion for judgment notwithstanding the verdict or for a new trial. It contends on appeal that it was not negligent as a matter of law; that plaintiff was negligent as a matter of law; that the trial court erred in permitting plaintiff to call for cross-examination two employees of Western Weighing and Inspection Bureau (WWIB) who inspected the boxcar as agents of defendant; that the trial court erred in admitting testimony of a medical doctor which was not based upon "reasonable medical certainty"; that the damages were excessive; and that the special interrogatories submitted to the jury should have required the jury to compare the negligence of FUGTA, who was not a party to the action, to that of plaintiff and defendant. We affirm.

Testimony established that Car No. 44558 was part of a train that arrived at one of FUGTA's rail yards in Superior, Wisconsin, on July 12, 1973. Upon entering the yard, each of the cars making up the train was given the usual "run-by inspection" by two

employees of defendant; neither inspector observed anything wrong with the boxcar. The car was subsequently brought to the grain elevator and, on July 18, 1973, was unloaded.[1] On July 20, the car was loaded with bulk wheat.

That same day, plaintiff and another employee, Scott Lyons, were instructed to close the doors on the newly loaded boxcars, since the opened outside doors are not touched in the loading process and must be closed afterwards. They had difficulty with the door on Car No. 44558 and worked on it for several minutes but could close it only 6 inches.[2] Plaintiff thereafter enlisted the help of two additional employees, and the four of them tried to close the door, one of them using a chain and another using a steel spike for leverage in attempting to close the door.[3] Plaintiff stood in front of the center of the door, trying to operate a handle which is supposed to raise the door so that it will slide along on wheels or ball bearings. None of the four employees observed anything wrong with the door. They had worked on it for 3 to 10 minutes, according to varying estimates, when the heavy door dropped below the upper retaining flange and fell top first, striking plaintiff.

After the accident, two inspectors, one an employee of Soo Line, the other of Burlington Northern, went to look at the door. Each testified that the upper door rail had buckled about ¼ inch for a length of about 1 foot and the lower door rail had sagged a corresponding amount. But neither believed that these imperfections contributed to cause the door to fall. Each testified that it appeared that two handles, which had broken and were hanging on the door, had been broken recently, and both opined that they were broken by use of a power device attached to the handles in order to open the door. One testified to his view of how the door fell off:

"I think a trap was set for these youngsters who opened the door. I think that a power device buckled that door enough to allow the lip of the top door flange to be adjacent to the bottom of the S-bar rail, and when these men who were prying on the door, they encouraged it to move so the lip passed on the outside of the bar rail, and the door came off."

An assistant car foreman testified to a similar opinion that "[i]t had to be extreme pressure put on the front of that door in opening it, and, therefore, bulging the top rail as well as the bottom, and then when the door was being tried to—it was in the process of being closed, it snapped the whole door out."

At the time of the accident, plaintiff was 24 years old. He was taken to the hospital, where his leg, which was locked into a flexed position by the impact of the 460-pound door, was straightened. He underwent surgery the next morning for removal of the shattered kneecap and reconstruction of the patellar tendon. His knee was put in

---

1. The car dump operator described the unloading procedure used at the elevator. A boxcar is rolled up onto a platform and grabbed by a "bolster," which is a piece of equipment with two arms that push the wooden grain doors out of the way, "lock up into" the car, lift the car into the air, and tilt it back and forth. Usually when the car is rolled up onto the platform its steel outer doors have already been opened, but in the few cases where this has not been done a power device is used to pull them open. After a boxcar is unloaded, it is "stripped" (the grain doors are removed) and "coopered" (prepared for reloading) by employees of Western Weighing and Inspection Bureau (WWIB). WWIB is a wholly owned subsidiary of approximately 125 railroads, including defendant. Its employees inspect and prepare cars for shipping as agents of those railroads. The two WWIB employees who stripped and coopered Car No. 44558 on July 18 and July 19 testified that they visually inspected the car during the course of their work and found no defects. One testified that the door, which he had to open further, worked "perfectly."

2. Scott Lyons testified they worked on it for less than 5 minutes. Plaintiff testified they worked on it 3 to 4 minutes, although in a pretrial deposition he had estimated the time at 5 to 10 minutes.

3. Plaintiff did not advise the foreman of his difficulty with the door, although plaintiff was aware that he could report to the foreman, who would in turn decide whether to ask the railroad company to send one of its own employees to close it.

a cast; he was hospitalized for 7 days and remained in a cast for about 6 weeks. Upon removal of the cast, plaintiff's physician, Dr. Peter Boman, started him on a regimen of exercises to regain flexing mobility in the knee. After a month, Dr. Boman advised therapy at the Polinsky Rehabilitation Center. Plaintiff then began to regress, and on November 15, 1973, he was placed under anesthesia while the doctor manipulated his knee. Plaintiff's mobility began to improve, but he could not straighten his leg all the way. Consequently, in March 1974, he again underwent surgery, this time to shorten the quadriceps tendon. He was hospitalized for 1 week and remained in a cast for almost 2 months more. Plaintiff proceeded to gain full motion in his knee, his quadriceps muscles became stronger, and the stability of his knee improved. In November 1974, "he had had a few episodes of giving way but he walked very well." The doctor described "giving way":

"This type of situation was noted primarily when he was walking downhill. These kind of things, when the knee is weak, when you are walking stairs or downhill or upstairs, you will notice particularly the weakness in the quadriceps muscles if they are not real strong; they will tend to give you a sensation of giving way."

Dr. Boman released plaintiff from his care in June 1975; he testified that at that time, plaintiff's stability and muscle tone were better; but "this is a very long drawn out affair when a knee has been badly injured, and several surgeries, and it takes a long time to regain the strength in the muscle." He recommended that plaintiff not return to work as a laborer in the interest of preserving his knee.

It was Dr. Boman's opinion that plaintiff sustained a 30-percent permanent partial disability. He testified that plaintiff has difficulty climbing stairs since loss of a kneecap results in loss of some of the power to extend the knee. In bringing the tendon closer to the joint itself, some leverage is lost "and so you have to figure about a fifteen or twenty percent loss in quadricep strength by removing a kneecap." However, the doctor stated that this loss can be overcome by building up the quadriceps, although this is difficult to do "and causes problems with weakness and giving way."[4]

Dr. Boman further testified that X rays of plaintiff's knee showed signs of "traumatic degenerative arthritis." Because of numerous objections to questions of the doctor which were not phrased in terms of "reasonable medical certainty," the trial court finally recapitulated the testimony on the issue of arthritis.

"THE COURT: And you testified that the arthritic condition he saw here was, with reasonable medical certainty, as a result of the trauma on that day; that is established.

"MR. McPARTLAND: That's right, Your Honor.

"THE COURT: Now, the next step we are at is how long it's going to continue or the extent of it or whether it's going to be, as a result of other things in the accident, the developing of it, and so forth. Can you give an answer with reasonable medical certainty that is other than speculative or a guess?

"THE WITNESS: Well, the only thing I can say is that these type of things do progress. That's a known fact.

"THE COURT: All right. That is within a medical certainty?

"THE WITNESS: Right. Once the arthritic changes occur, they tend to progress. As to the rate they progress, this varies from individual to individual, and I can't give you a time as to how long it will take to accomplish these things.

"The chances are, Dan being at his age, a young man, if he lives a normal expected lifetime, he is going to have to have

4. Before the accident, plaintiff had been active in sports. Since then, due to his weak knee, he has been unable to play baseball or hockey. Even playing golf causes his knee to swell. During the winter, he has difficulty walking. "If I hit an icy spot or something, I will get a whiplash action in my leg."

something done to the knee during that lifetime."

Finally, plaintiff's attorney asked:

"Q Doctor, with the present condition of Mr. Hake's knee, could you tell us, within a period of years, when approximately you feel that this condition will reach a stage where further surgical procedures will have to be done, with reasonable medical certainty?

"A Well, he will have, I'm sure, within probably fifteen years, have enough degenerative changes that some type of procedure—but there's a lot of things that can vary this that we talked about earlier.

"Q You feel it will be within fifteen years?

"A I think that's reasonable to say that, because of the amount of change present."

The doctor approximated the cost of the surgical procedure, by which an artificial knee joint is constructed, at $4,200. The surgery would require hospitalization for about 2 weeks and recovery time of 3 to 6 months. The parties stipulated that plaintiff's medical expenses prior to trial were $2,797.87.

At the time of the accident, plaintiff had been working full time at FUGTA for 16 months and had intended to continue working there. Before beginning this employment, he had completed about 2½ years at the University of Minnesota, Duluth, with passing grades. At the time of the trial, plaintiff was considering returning to school but had not yet decided whether to do so. Meanwhile, he had been unemployed for 2½ years, and had not sought employment during this period. Dr. Boman testified that as of November 1974, 1 year before trial, plaintiff was physically capable of returning to school or of working at a nonlabor job.

Plaintiff was earning $4.34 an hour at the time of the accident, although some time later the employees were awarded a retroactive raise in wages. Had he continued to work in that capacity, he would have been receiving $5.80 an hour at the time of trial.

An employee hired the same day as plaintiff and performing the same work earned approximately $10,900 in 1973; $10,800 in 1974; and in January through October 1975, during which period the employee was laid off part of the time, he earned approximately $6,000.

William Spehar, a placement supervisor at the Minnesota State Employment Service, was called as a witness by plaintiff. He testified that plaintiff would probably be eliminated from consideration for any job which required a physical examination and that he would need to be retrained for almost any occupation; but the more professional the employment, the less deterrent the disability would be. Therefore, plaintiff is employable but at a limited number of jobs. Spehar stated that a nonlabor job such as in retail sales would pay between $2.50 and $3.25 an hour. The higher paying job of a machine operator would probably be unavailable to plaintiff because of the necessity of standing for long periods of time.

■ 1. The issues raised by defendant, other than its claim of excessive damages and its claim that the jury should have been required to compare the negligence of FUGTA to that of plaintiff and defendant, warrant little discussion. Its contention that as a matter of law it was not negligent is without merit. The jury could find that the outer door on Car. No. 44558 was buckled by a power device in the process of unloading the car and that in preparing the car for reloading the WWIB employee should have discovered in the course of a reasonable inspection that the door was jammed. Similarly, its contention that plaintiff was himself negligent is without merit. Whether plaintiff attempted for an unreasonable length of time or by means of an unreasonable method to open the door, given the occasional practice of calling a railroad employee to open sticky doors, presented a jury question.

■ Defendant argues that the trial court erred in allowing plaintiff to call two employees of the WWIB for cross-examina-

tion under Rule 43.02, Rules of Civil Procedure.[5] The trial court considered this question "a borderline case." It is not disputed that the WWIB employees inspected boxcars for and on behalf of the defendant railway company, and that defendant would be liable for their negligence in performing the inspection duties delegated to them. Under these circumstances, the trial court did not err in finding them "employees" for purposes of cross-examination under Rule 43.02, Rules of Civil Procedure, on the issue of their performance of the inspection duties.

■ Defendant's argument that the trial court erred in admitting speculative testimony by Dr. Boman is answered by the excerpts quoted above, which confirm that his testimony was properly couched in terms of "reasonable medical certainty."

■ 2. We turn, then, to defendant's contention that the damages awarded were excessive and appear to have been given under the influence of passion or prejudice. Rule 59.01(5), Rules of Civil Procedure. Whether the damages are excessive is a matter addressed in the first instance to the discretion of the trial court. Where the trial court, having heard the testimony and observed the parties and witnesses, has passed upon the award and has allowed it to stand, we will not order a new trial or a remittitur unless there is manifestly a clear abuse of discretion. *Gilbertson v. Gross,* 232 Minn. 373, 45 N.W.2d 547 (1951). We will interfere with the trial court's decision only where "there is a plain injustice or a monstrous or shocking result," *Kennedy v. Caudell,* 277 Minn. 35, 39, 151 N.W.2d 407, 410 (1967); or where "it is fairly evident that the trial judge failed to keep the jury within the bounds of reason and common sense." *McCormick v. Malecha,* 266 Minn. 33, 43, 122 N.W.2d 446, 453 (1963).

■ Defendant contends with some force that passion or prejudice of the jury was inspired by counsel's reference, in final argument, to the death of the crew of the "Edmund Fitzgerald," an ore ship which sailed from Duluth and sank in a storm during the course of the trial. Defendant, however, neither objected to these irrelevant remarks before the jury retired to deliberate nor requested a curative instruction. An objection to improper remarks, a request for curative instruction, and a refusal by the trial court to take corrective action are generally prerequisites to the obtaining of a new trial on appeal except where the misconduct is so flagrant as to require the court to act on its own motion, or is so extreme that a corrective instruction would not alleviate the prejudice. *Bisbee v. Ruppert,* 306 Minn. 39, 235 N.W.2d 364 (1975); *Patton v. Minneapolis Street Ry. Co.,* 247 Minn. 368, 77 N.W.2d 433 (1956); *Janicke v. Hilltop Farm Feed Co.,* 235 Minn. 135, 50 N.W.2d 84 (1951). Although these remarks were improper and a curative instruction would have been appropriate, we hold that they were not so extreme as to require a new trial.

■ In any event, we cannot say that the damages awarded "so greatly exceed adequate compensation as to be accounted for on no other basis than that of passion or prejudice." *Gilbertson v. Gross,* 232 Minn. 373, 375, 45 N.W.2d 547, 548 (1951). We agree with the trial court that the jury's award was substantial but not so excessive as to be clearly a result of passion or prejudice. Plaintiff suffered a permanent 30-percent disability of the knee and can no longer perform in the vocation for which he is qualified. Nor can he pursue those athletic avocations in which he was previously active. He has twice undergone surgery and has incurred, and may well in the future incur, substantial special damages for medical costs and loss of wages. The jury could properly consider these elements of damages.

---

**5.** Rule 43.02, Rules of Civil Procedure, provides in relevant part: "A party may call an adverse party or his managing agent or employe * * * and interrogate him by leading questions and contradict and impeach him on material matters in all respects as if he had been called by the adverse party."

Defendant also argues that the jury awarded damages without regard to the evidence but, rather, by taking an average of the amounts suggested by counsel in their respective closing arguments. Defendant cites *Blume v. Ronan,* 141 Minn. 234, 169 N.W. 701 (1918), as authority for the proposition that a new trial is therefore required. The case of *Blume v. Ronan, supra,* is inapposite. It was an action on a contract for sale. Plaintiff there contended that defendants had agreed to pay $470 for 11 head of cattle delivered to them; defendants argued that they had agreed to pay $450 for 12 head of cattle, and owed $414 for the 11 delivered. On that evidence, the jury could return a verdict for either $414 plus interest or $470 plus interest, and the trial court so directed. The jury instead returned a verdict which "split the difference to a cent between the two amounts named," 141 Minn. 235, 169 N.W. 701. There was no basis in the evidence for such an award.

■ Damages for personal injury, as in the instant case, in contrast, are not similarly fixed. The jury in its judgment could return a verdict for an amount anywhere within a fairly broad range. Although the award in this case approximated the average of the respective amounts argued by counsel, it by no means split the difference to a cent and, of determinative significance, there was a basis in the evidence for the award.

■ 3. Defendant's final contention—that the trial court erred in refusing to include on the special verdict form submitted to the jury an interrogatory relative to the negligence of FUGTA—is of greatest interest in this case.[6] Defendant contends that under Wisconsin or Minnesota law,[7] the jury should have been required to compare the negligence of FUGTA to that of plaintiff and defendant, even though FUGTA was not a party to the action.[8]

Defendant apparently believes that a finding of FUGTA's negligence would entitle defendant to contribution or indemnity from FUGTA or would preclude FUGTA's claim for reimbursement out of the damages paid by defendant.[9] Alternatively, defendant hypothesizes that inclusion of the employer in the special interrogatory might have resulted in a finding by the jury that FUGTA, and not defendant, was 100-percent negligent.[10] The trial court apparently accepted defendant's assumption that a finding by the jury of negligence on the part of FUGTA would have some effects on FUGTA;[11] hence the court's concern that

6. Defendant argues that FUGTA could be found negligent in any of several ways: Failure to properly inspect Car No. 44558 prior to loading; failure to provide plaintiff with a safe place to work; failure to properly instruct plaintiff on safe methods of closing boxcar doors; failure to require the railroad company to handle the door. Defendant's efforts to prove negligence by FUGTA were limited to some extent by trial court rulings; e. g., its refusal to admit testimony showing that a power device had been used to open the door of Car. No. 44558.

7. Defendant argues that Wisconsin law governs this case because the accident occurred in Wisconsin and plaintiff received from FUGTA workmen's compensation benefits under the Wisconsin statute.

8. Wisconsin law prohibits joinder of an employer liable for workmen's compensation benefits in an action by an employee against a negligent third party. Wis.St. 102.03(2). At the time this action was tried, Minnesota permitted joinder of an employer, but only for purposes of indemnity. *Carlson v. Smogard,* 298 Minn. 362, 215 N.W.2d 615 (1974).

9. Defendant writes in its brief: "If the verdict against Defendant is allowed to stand, Plaintiff's employer, FUGTA, will be profiting by its own negligence."

10. Defendant writes in its brief: "The Trial Court in its memorandum stated that even 'Had the employer been included as a third-party defendant, it is clear by Minnesota case law that the defendant tortfeasor could have been allowed indemnity only against the third-party employer and not contribution.' * * * Such a conclusion by the Trial Court begs the question that if FUGTA was included in a special verdict form what would the jury have done in apportioning negligence? It is certainly arguable that they could have apportioned 100% of the causal negligence against FUGTA."

11. The trial court stated in its memorandum: "In Wisconsin, as distinct from Minnesota, the Workmens Compensation Statute, 102.03(2),

"[a] party who could have been named but was not and had no opportunity to partake in the trial should not be made to suffer a responsibility when he has had no opportunity of representation and defense."

▉ Assuming, arguendo, that Wisconsin law applies, the cases cited by defendant disclose no support for defendant's assumption that where the jury finds that the negligence of an employer who has paid workmen's compensation benefits contributed to cause an employee's injury, contribution or indemnity will be allowed to a third-party tortfeasor. To the contrary, Wisconsin cases consistently hold that the sole liability of an employer is under the workmen's compensation statute: No claim for contribution lies against an employer who has paid workmen's compensation benefits,[12] and no claim for indemnity lies in the absence of an express contractual provision.[13]

▉ It is true that under Wisconsin law the negligence of an employer is required to be submitted to the jury. *Payne v. Bilco Co.*, 54 Wis.2d 424, 195 N.W.2d 641 (1972). The purpose of this submission is to properly apportion the negligence among the *joint tortfeasors* and does not result in a judgment of liability against the employer.[14] However, the Wisconsin court has held that the failure of the trial court to include the question of a third party's negligence is not prejudicial where, assuming the jury would find "the same relative comparison between the parties involved in the lawsuit (whose negligence was apportioned), the only effect of attributing negligence to the third party would be to make the defendants liable for a higher percentage of the total damage." *Hardware Mu-*

*tual Cas. Co. v. Harry Crow & Son, Inc.*, 6 Wis.2d 396, 408, 94 N.W.2d 577, 583 (1959). Accord, *Patterson v. Edgerton Sand & Gravel Co.*, 227 Wis. 11, 277 N.W.2d 636 (1938).

In contrast, in the more recent case of *Connar v. West Shore Equipment of Milwaukee*, 68 Wis.2d 42, 227 N.W.2d 660 (1975), the court reversed for failure of the trial court to submit the issue of the employer's negligence to the jury. There the plaintiff brought suit against two tortfeasors. The jury apportioned 34 percent of causal negligence against plaintiff; 25 percent against one defendant; and 41 percent against the second defendant. Because plaintiff's negligence exceeded that of one defendant, the latter was dismissed. The damages assessed against the remaining third party were 66 percent (100 percent less the 34 percent attributable to plaintiff). In reversing, the court stated:

"* * * While there may well be cases in which a future jury can be presumed to return a verdict consistent with the verdict which has been set aside, we cannot so presume in this case. There was evidence of record which reflected the jury's desire to make quite a different apportionment of negligence were [employer] Druml included." 68 Wis.2d 46, 227 N.W.2d 663.

▉ In this case, defendant has shown no prejudice to it. There is no basis on which to presume that had FUGTA been included the jury would either have found plaintiff contributorily negligent or FUGTA 100-percent negligent. Only in the event of either of those two possibilities would the liability of defendant be less than as assessed below. We conclude that the application of Wisconsin law would result in

---

prohibits a suit by an original tort feasor against a third-party employer, *and, therefore, the inclusion of the employer is allowed to determine the right of the tort feasor to indemnity or contribution.*" (Italics supplied.)

12. *A. O. Smith Corp. v. Associated Sales & Bag Co.*, 16 Wis.2d 145, 113 N.W.2d 562 (1962); *Wisconsin Power & Light Co. v. Dean*, 275 Wis. 236, 81 N.W.2d 486 (1957).

13. *Grede Foundries, Inc. v. Price Erecting Co.*, 38 Wis.2d 502, 157 N.W.2d 559 (1968); *Engel v. Bindel*, 27 Wis.2d 456, 134 N.W.2d 404 (1965).

14. The employer is not a joint tortfeasor; because its liability under the workmen's compensation statute extinguished its liability in common law tort, it shares no common source of liability in negligence with a third party. *A. O. Smith Corp. v. Associated Sales & Bag Co. supra.*

holding that the omission of FUGTA was not prejudicial error.

 Defendant argues alternatively that under Minnesota law the issue of FUGTA's negligence should have been submitted to the jury. We have recognized a third party's limited right to indemnity from an employer and for that purpose have allowed a third party to join an employer in an action brought by an employee against a third party. *Carlson v. Smogard,* 298 Minn. 362, 215 N.W.2d 615 (1974). Since the appeal was taken in this case, we have overruled previous decisions[15] and now also allow contribution against an employer in an amount not to exceed the compensation benefits paid or to be paid by the employer to the employee because of an injury for which the third party was also liable. *Lambertson v. Cincinnati Corp.,* Minn., 257 N.W.2d 679 (filed February 4, 1977). To recover contribution or indemnity against an employer, the employer must be a party to the action. Defendant did not join FUGTA in this one. Rudimentary principles of law establish that any judgment entered in this case in FUGTA's absence cannot bind FUGTA. Insofar as defendant suggests that an apportionment of negligence by the jury to FUGTA would have resulted in shared liability between FUGTA and defendant, defendant is mistaken and the trial court did not err in refusing to submit the issue. Given the additional circumstances, as discussed above, that the submission of FUGTA's negligence would presumably have resulted in the same relative apportionment of negligence as between defendant and plaintiff, the failure to submit to the jury the question of FUGTA's negligence did not otherwise prejudice defendant.[16]

Affirmed.

---

**15.** At the time this case was tried, we followed the majority rule which recognizes no right to contribution by a third party against an employer liable for worker's compensation benefits. *Hendrickson v. Minnesota Power & Light Co.,* 258 Minn. 368, 104 N.W.2d 843 (1960).

**16.** We have no occasion to intimate what action for contribution defendant might now undertake against FUGTA under the newly enunciated principles of *Lambertson v. Cincinnati Corp.,* Minn., 257 N.W.2d 679 (filed February 4, 1977). Whether Lambertson were to govern the action would, in any event, turn upon resolution of the choice of law question which defendant raised in this case but which we did not need to reach.