**GN DANAVOX, INC., a Minnesota corporation, Respondent,**

v.

**STARKEY LABORATORIES, INC., a Minnesota corporation, Appellant.**

No. C9–91–87.

Court of Appeals of Minnesota.

Oct. 8, 1991.

Review Denied Dec. 13, 1991.

Sandra F. Gilbert, John D. Kosanda, Courey, Schwinn, Kodadek & Albers, P.A., Minneapolis, for respondent.

Lawrence T. Hofmann, Terese S. Wallschlaeger, Zelle & Larson, Minneapolis, for appellant.

Considered and decided by PARKER, P.J., and FORSBERG and AMUNDSON, JJ.

## OPINION

AMUNDSON, Judge.

Starkey appeals from the trial court's order denying its post-trial motions for judgment notwithstanding the verdict (JNOV), remittitur, or a new trial. We affirm.

## FACTS

Danavox and Starkey compete in the manufacture and sale of hearing aids. In early 1987 Danavox claims it received reports Starkey's telemarketers had informed customers Danavox was going out of business. About the same time, Starkey purchased a small number of used hearing aids from Danavox. The parties' correspondence shows Starkey intended to use the hearing aids as parts in its all-make repair facility.

In July, Starkey circulated a flyer to over 10,000 of the parties' mutual customers. Entitled "Danavox Liquidation," the flyer claimed Starkey had received "large quantities" of Danavox hearing aids "[d]irect from Denmark." At trial, Danavox introduced three dictionary definitions indicating the word "liquidation" means "going out of business." Danavox also stressed that only 365 hearing aids had been purchased by Starkey, a relatively small amount in the hearing aid industry, and that the phrase "direct from Denmark" implied Danavox no longer existed in the United States.

Following distribution of the flyer, Danavox received approximately 100 telephone calls from customers questioning whether it was still in business. Many of the calls reflected concerns whether Danavox could service or warrant its hearing aids. J. Stephen West, Danavox's president at the time, testified that if a customer begins to question whether a manufacturer will be able to fulfill a warranty, that customer will purchase from another company. Larry Griffith, Danavox's national sales manager, testified he received between 10 to 20 telephone calls from customers wanting to know what was happening to Danavox. Griffith further estimated that for every

customer who responds, 10 to 15 with similar concerns will not respond.

Gerald Gitles, the president of a competitor hearing aid company, testified he received about 20 inquiries from customers as a result of the flyer, asking if Danavox was going out of business. Steve Chargo, one of Starkey's telemarketing managers, testified customers had called him or people in his department asking whether Starkey had purchased Danavox or whether Danavox was going out of business. Customer Gregory Wales testified when he received the flyer he thought Starkey had bought Danavox and they were dumping the products.

Within a week after West learned of the flyer, he began to interview public relations firms because he had concerns that customers no longer believed in Danavox's long-term viability. West eventually hired Wallace Public Relations, Inc. West's testimony suggests it was during these interviews that Wallace recommended Danavox keep track of customer calls.

West prepared a log form sheet and directed his employees to record customer calls. He testified "I'm not sure whether [keeping the logs] was [Wallace's] idea or mine." The logs were kept for only one and one-half to two months, until the volume of calls decreased. West testified the logs were kept in the regular course of business, and were not made with the intention of preserving customer complaints for litigation.

After the flyer was distributed on July 18, 1987, West testified Danavox experienced a significant drop in sales in its total product base. Although Danavox had budgeted higher sales for July than June because the company was entering its historically highest sales period of the year, July sales dropped by 30 percent. West and current Danavox president William Herzog testified there was no reason for the drop in sales other than the Starkey flyer. West further testified Danavox had been operating profitably in the months preceding the flyer and fully expected that trend to continue.

Starkey's telemarketing manager Chargo testified he believed there was nothing wrong with sending out a flyer with the word "liquidation" next to a competitor's trademark and logo even with the certain knowledge it makes customers think the competitor is going out of business. Chargo indicated he would not hesitate to send out such a flyer in the future. William Austin, Starkey's president and sole shareholder, authorized release of the flyer. Austin's testimony also indicated he believed there was nothing wrong with the flyer.

Respondent GN Danavox, Inc. sued appellant Starkey Laboratories, Inc., alleging deceptive trade practices, defamation, intentional interference with business relations, false advertising, and consumer fraud. Danavox later amended its original complaint to include trademark infringement, breach of contract, and punitive damages claims.

During the trial, the court directed verdicts in Starkey's favor on the trademark infringement, interference with business relations, consumer fraud, and false advertising claims. By special verdict the jury awarded Danavox $4,729.20 on its breach of contract claim and $517,752 on its defamation claim. In addition, the jury found Starkey liable for deceptive trade practices. Accordingly, the trial court awarded Danavox $31,846 in attorney fees and $13,325.20 in costs, and permanently enjoined Starkey from engaging in further deceptive trade practices against Danavox. Finally, the jury found Starkey's defamatory conduct was in deliberate disregard of Danavox's rights and awarded Danavox $1.5 million in punitive damages.

## ISSUES

1. Did the trial court err in admitting into evidence the logs kept by Danavox employees?

2. Did the trial court err in submitting the punitive damages issue to the jury or abuse its discretion in denying Starkey's motion for remittitur of the punitive damages award?

3. Did the punitive damages award violate Starkey's right to due process guaranteed under the United States or Minnesota Constitutions?

## ANALYSIS

### I

■ 1. Danavox initially argues Starkey failed to preserve the evidentiary issue it now raises because its notice of motion and motion for post-trial relief alleged no specific grounds under Minn.R.Civ.P. 59.01. However, Starkey objected at trial to admission of the logs and addressed the issue in its memorandum supporting the new trial motion. Consequently, Danavox was given an opportunity to respond, and the trial court could address the issue in its order and memorandum denying Starkey's new trial motion. Under these circumstances, Starkey preserved the issue for appeal. *See Sauter v. Wasemiller*, 389 N.W.2d 200, 201–02 (Minn.1986).

■ In addition, Danavox's argument that Starkey's memorandum in support of its new trial motion was untimely served is unpersuasive. Starkey met the time limit of Minn.R.Civ.P. 59.03, which merely requires notice of the new trial motion be served within 15 days of a general verdict.

■ 2. Starkey contends the statements contained in the logs kept by employees were inadmissible hearsay. We disagree. The logs and the statements are not hearsay because they were not offered by Danavox to prove the truth of the matters asserted. *See* Minn.R.Evid. 801(c) ("hearsay" is defined as a statement offered to prove the truth of the matter asserted). Danavox offered the logs to show its customers were concerned it was going out of business, and to show why Danavox took steps to curb the flyer's negative effects, including hiring a public relations firm.

■ In addition, Starkey's argument that the trial court erred by failing to give the jury a limiting instruction lacks merit. Starkey neither objected to the trial court's hearsay instruction at the close of trial nor requested a more specific instruction. In fact, the court incorporated Starkey's proposed hearsay instruction into its own. Under these circumstances, the trial court did not err.

■ Even if the log's admission was erroneous, Starkey was not prejudiced. *See Thurman v. Pepsi–Cola Bottling Co.*, 289 N.W.2d 141, 145 (Minn.1980) (party complaining of discretionary ruling must show prejudice). The logs and the statements therein were not crucial to Danavox's defamation claim; instead they were merely cumulative of other evidence showing that after the flyer's release, Danavox's sales dropped off, customers inquired about Danavox's stability, and a public relations firm had to be hired. Accordingly, the trial court did not err.

### II

Starkey argues that the trial court improperly submitted the punitive damages issue to the jury. Punitive damages are allowed in civil actions "only upon clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others." Minn. Stat. § 549.20, subd. 1(a) (1990). Starkey advances three arguments to reverse or remit the punitive damages award, each of which we find unpersuasive.

■ Starkey first claims it never intended to imply Danavox was going out of business or to otherwise deceive the public. Its claim, however, is largely negated by the flyer itself, which contained so many misrepresentations it is difficult, if not impossible, to conclude they were unintended. Further, Starkey's other actions, such as having its telemarketers reporting Danavox was going out of business, suggest Starkey intended to injure Danavox. In short, the evidence showed that Starkey knew circulation of the flyer created a high probability of injury to Danavox's business, yet it acted with disregard for Danavox's probable injury. *See* Minn.Stat. § 549.20, subd. 1(b). Thus the trial court properly submitted the issue of punitive damages to the jury.

■ Second, Starkey contends the punitive damages award was founded upon compensatory damages which were based on inadmissible evidence and irrelevant testimony. This argument is related to Starkey's previously rejected argument that the logs were inadmissible. As we have already concluded, the logs were corroborated by other evidence which tended to show the flyer negatively affected Danavox's business and reputation. We also find unpersuasive Starkey's argument that the $517,752 compensatory damage award is inflated and operates as a punitive damages award. While high, the jury's estimate of damages is supported by the evidence which showed Danavox suffered losses in sales, reputation, opportunity, and service business.

■ Third, Starkey argues the $1.5 million punitive damages award was based upon passion and prejudice. Starkey insists it was wrongly portrayed throughout trial as a large, rich company trying to eliminate its competition at any cost. This characterization, however, was supported by the conduct of Starkey employees and of its president at trial and during depositions. Accordingly, we accord deference to the trial court's decision and uphold the award. *See Hake v. Soo Line Ry.*, 258 N.W.2d 576, 582 (Minn.1977).

### III

■ Starkey finally argues the punitive damage award violated its right to due process. While Starkey failed to notify the attorney general as required by Minn. R.Civ.P. 24.04, the issue is important enough to warrant our consideration, and has been adequately briefed by the parties in the trial court and this court. *See Elwell v. County of Hennepin*, 301 Minn. 63, 73, 221 N.W.2d 538, 545 (1974).

In *Pacific Mut. Life Ins. Co. v. Haslip*, —— U.S. ——, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), the Supreme Court held that punitive damages awarded by an Alabama jury did not violate the fourteenth amendment's due process clause. In doing so, the Court stressed that the defendant was accorded procedural protections by adequate jury in-

structions, by post-trial procedure for scrutinizing the punitive damages award, and by the state's supreme court review. *Id.* at ——, 111 S.Ct. at 1046. The Court did note, however, that the $840,000 punitive damage award, which was more than four times the compensatory award, "may be close to the line" of constitutional impropriety. *Id.*

■ Starkey argues Minn.Stat. § 549.20, subd. 3 violates due process by permitting a jury to consider the financial condition of a defendant. In *Haslip*, the jury was not permitted, as a matter of state law, to consider or receive evidence of the defendant's wealth when it awarded punitive damages. *Id.* at ——, 111 S.Ct. at 1044. Financial position was, however, a factor which the trial court in *Haslip* considered when reviewing the propriety of the jury's award. Minn.Stat. § 549.20, subd. 5 similarly requires the trial and appellate courts to consider a defendant's financial condition when reviewing an award of punitive damages.

Starkey insists consideration of the defendant's financial condition does not advance the purpose of punitive damages, and breeds arbitrary and irrational deprivation of a defendant's property. We disagree. By having such financial information, a jury is better able to determine the amount necessary to punish or deter a defendant for its wrongful conduct. *Cf. Johnson v. Ramsey County*, 424 N.W.2d 800, 806–08 (Minn.App.1988) (trial court's remittitur of $300,000 punitive damage award to $50,000 upheld where jury was provided no specific information on defendant's ability to pay), *pet. for rev. denied* (Minn. Aug. 24, 1988).

■ Starkey also argues its due process rights were impaired by the trial court's failure to make specific findings when reviewing the punitive damages award. Minn.Stat. § 549.20, subd. 5. The trial court's memorandum and order denying Starkey's post-trial motions, however, incorporated a large portion of Danavox's post-trial memorandum, which addressed the necessary factors. This incorporation

and the remainder of the trial court's memorandum satisfy the findings requirement of the punitive damages statute.

## DECISION

The order denying Starkey's motions for JNOV, remittitur, or a new trial is affirmed.

Affirmed.